[Civ. No. 6548. First Appellate District, Division One.—September 30, 1929.]

MABEL BURDELL LICHTENBERG, Plaintiff and Appellant, v. JAMES B. BURDELL, Defendant and Appellant.

R. P. Henshall, Robert R. Moody and Nat Schmulowitz for Plaintiff and Appellant.

Brittain & Weise, Brobeck, Phleger & Harrison and Maurice T. Dooling, Jr., for Defendant and Appellant.

PARKER, J., *pro tem.*—This action was commenced to declare a trust in favor of plaintiff and to enforce an accounting thereof.

In the court below plaintiff prevailed and after accounting had it was found that a large sum of money was due to the plaintiff and judgment entered accordingly. The defendant appeals from said judgment and urges that under the facts as shown no judgment at all should have been rendered against him. Plaintiff appeals and contends that under the

facts found by the trial court, as a matter of law, the judgment should be for a much greater amount.

The basis of the action and the theory upon which it was tried embrace fraud and concealment on the part of an executor with reference to the funds of the estate of his testator. It therefore becomes necessary that we review, in some detail, the facts of the controversy.

Plaintiff and defendant are brother and sister, and, as far as the record discloses, are the only children of Mary A. Burdell, deceased. In order to avoid a possible confusion of names we will refer to Mary A. Burdell hereafter as the mother. The mother died some time in the year 1900, and at the time of her death she was survived by her husband, Galen Burdell, and the children named. The plaintiff at that time was the wife of one John Coleman and there was one child of their union, a daughter, Kathlynne, at that time a minor. Prior to her death, the mother had made a last will and testament and also a codicil thereto. After her death, and after proceedings regularly had, the will and codicil were admitted to probate in the Superior Court of the state of California in and for the county of Marin and the persons designated by her as executors were duly appointed as such and thereafter qualified. These executors were the surviving husband, Galen Burdell, James B. Burdell, defendant, and John Coleman, husband of the plaintiff. Here it might be noted that at or about this time, in any event, during the times in question here, plaintiff and the said John Coleman had discontinued their marital relations and a decree of divorce had been entered. Likewise it might be noted that notwithstanding this, the said John Coleman was and remained the guardian of the estate of the minor Kathlynne. The estate of the decedent was of a value in excess of $400,000 and with the exception of a few minor personal bequests the entire estate was devised to the parties hereinbefore named by specific bequests to each.

The general thought prevailing throughout the instrument was that eventually, after a life estate in a portion to the husband, the entire estate, with little exception, should go in equal shares to the son James Burdell in fee and the daughter Mabel Coleman, the plaintiff here, for life with remainder over to her issue. The instrument was dated November 7, 1899.

There are two provisions of this will which demand specific attention, namely, paragraphs nine and ten thereof. Paragraph nine is as follows:

"I give and bequeath unto my son James B. Burdell all the shares owned by me at the time of my death in the corporation known and designated as The Western Refrigerating Company."

Paragraph ten reads:

"I give and bequeath to my daughter Mabel such portion of the Nicasio Ranch as shall be equal in value as appraised in the inventory of my Estate, to the value of the shares in the Western Refrigerating Company devised to my son James. To have and to hold the same for her use and benefit during the period of her natural life; and upon her death I give and bequeath the same unto her children living at the time of said event in equal shares."

The codicil to the will was dated January 16, 1900. Little change is made in the previous terms of the will, but there are two paragraphs in this codicil that are worthy of note, namely, paragraphs two and five. Paragraph two reads:

"After that portion shall have been taken from the Nicasio Ranch to make up the equivalent of the shares in the Western Refrigerating Company now known as the Electric Light and Power Company, which is bequeathed to my daughter Mabel for life in paragraph Tenth of my will, I give and bequeath the remainder of the said Nicasio Ranch to my husband Galen Burdell to have, hold and enjoy the same during the term of his natural life . . . " (Then follows disposition of remainder.)

Paragraph five reads:

"The portion of the Nicasio Ranch bequeathed to my daughter Mabel, etc., as the equivalent of the shares in the Western Refrigerating Company now the Electric Light and Power Company is to include the dwelling house and such portion of the lands adjoining or surrounding the same as may be selected by her of the value directed."

The mother died on January 23, 1900, and the will was admitted to probate on March 5, 1900, at which time the executors were appointed.

In the regular course of probate appraisers were appointed and on October 11, 1900, the inventory and appraisement

of the estate was filed. This inventory, as far as it is before us in the present record, contains the following:

> 1396 shares in Petaluma Gas & Electric Company, appraised at ...........$40,000
>
> 146 shares in Western Refrigerating Co.. 1,000

In the early part of 1901 Mr. John Martin comes into the field as an organizer and promoter of power and light corporations. At that time this class of corporation was somewhat in disorder; there being many small companies, each covering a limited field. Martin had already secured numerous little companies throughout the state and being, as he modestly admitted, a man of vision, his purpose was to group many of these corporations and form a larger controlling company. At this period he was operating a corporation known as and called California Central Gas and Electric Company. The record discloses that this corporation was, to a great extent, if not wholly, the mere instrumentality of Martin, who owned a large majority of the stock.

In the spring of 1901 Martin began negotiations with defendant James B. Burdell, looking toward the purchase of the properties called Petaluma Gas and Electric Company. This was the same company whose stock was inventoried in the estate of Mary A. Burdell. It will assist in outlining the case to dwell further on the condition of this Petaluma Gas and Electric Company, briefly, for the present. Mrs. Burdell, the mother, as her estate indicates, was a person of wealth. Her interests had been mostly in farming lands and livestock. Her favored interest was the development of the dairy industry and the installation of modern methods and refrigeration. She had visited fairs and agricultural expositions in many places and was interested in starting something in the ·section where her properties were located. Some time in 1897 or thereabouts there was for sale an old electric light plant in Petaluma and it was her idea that a refrigerating plant could be operated with the same overhead and crew of help. Accordingly she purchased this plant and business known as the Petaluma Light and Power Corporation. This was the beginning of her venture along the line of distribution and sale of electric light and energy and the supplying of gas. Subsequently she purchased other machinery and equipment to the point where

she organized the corporation whose stock is referred to in the inventory. Her power and light business was conducted on a small scale, compared with present methods, and she remained the sole owner of all of the stock in the corporation formed. The business of refrigeration was conducted under the same roof as the power business, the rooms being divided into various departments wherein there was an ice plant, a creamery and butter business and the vegetable and produce business.

As may be more or less frequent where several corporations are organized and controlled by the same persons, there were, from time to time, dealings between the corporate entities whereby properties were exchanged and agreements made. As is likewise usual, these transactions really, by a person with himself, leave much indefinite and uncertain as to the exact status of either the person or his or her corporations. It will suffice to say that both the refrigerating plant and the power plant, while each a separate corporation, were entirely owned by the mother and operated, in a great measure, together. The means of gas distribution were antiquated; the power plant was equipped with even then old machinery and the refrigeration and icing plant was put together with mixed new and second-hand machinery. This was the situation when John Martin entered the Petaluma field.

The trial of the present action in the court below was commenced in June, 1926, and John Martin was called as a witness for plaintiff. An analysis of his testimony disclosed that he had some general knowledge, that in 1901 he had purchased an electric plant or the stock of an electric plant in the city of Petaluma and in the purchase had negotiated with James B. Burdell. He did remember the price paid and that is about the extent of his testimony. His story of the transaction was not relied upon by plaintiff nor did the court find the facts as Martin recalled them. This is in no way intended as a criticism of the witness. He stated throughout his testimony, as was the fact, that he was in 1901 engaged in many big projects, of which this Petaluma matter was a comparatively small venture. He testified further that the details of the transfer and the questions of legal formalities were in the hands of the attorneys exclusively. And, further, his memory had not retained the

events of twenty-five years back. There is testimony, however, that the negotiations covered a period of several months. There was a difference in the price offered and the price asked; inspection was made of the premises, and title examinations were entered into. Negotiations ended in an agreement to sell to Martin the electric light plant and the refrigerating plant with its allied creamery and produce business. This last statement, in so far as it includes the refrigerating plant, is the subject of dispute, but found by the court and practically agreed upon by all sides, though denied equivocally by Martin.

We now go back to the record of the court in probate. On August 30, 1901, there was filed in said court a petition for order of sale of personal property. This petition was signed by the three executors and after preliminary recitals showing indebtedness of estate and need of funds, set forth the property desired to be sold. This property embraced 1396 shares of Petaluma Gas and Electric Company, 146 shares of the Western Refrigerating Company and five shares in the Dairyman's Union of California. The last-named shares have no connection with this case in any way and there will be no further mention thereof. The petition then recites: That the heirs of the deceased to whom the said 1396 shares would be distributed if not needed for the payment of the debts of the estate are Galen Burdell, husband; James B. Burdell, a son, and Mabel Smith, formerly Mabel Coleman, a daughter, all of whom are desirous that the said personal property should be sold and applied to the payment of the indebtedness. The petition then further recites: That the shares of the Western Refrigerating Company, although devised to James B. Burdell, are so connected with the gas and electric plant represented by the shares of the Petaluma Gas and Electric Company that it is necessary to sell the said shares with the others to secure a favorable sale of the same and it is absolutely necessary that all of the shares should be sold together. The petition prays for an order authorizing the sale of the said stocks. Pursuant to the law as it then read, the court set a date for hearing said petition and ordered notice thereof given by posting. Thereafter on September 10, 1901, the court made its order authorizing and directing the sale of the said stocks at private sale. This order recited that the 146 shares of West-

ern Refrigerating Company were so connected with the Petaluma Gas and Electric Company that it was necessary and advisable for a sale of the same to be made jointly with the shares of stock of the Gas and Electric Company in order to obtain a full and adequate price for the said shares of both companies and the order directed and authorized that the sale of the stock in these two companies might be sold jointly in one parcel.

On September 20, 1901, a return of sale was made and filed, which said return was executed by the three executors. It recited the proceedings had under the order of sale and that at the said sale there was received the bid of John Martin offering the sum of $65,000 for the stock mentioned. The return prayed the confirmation of the court. This return was verified by each and all of the executors. After proceedings regularly had, the court on September 26, 1901, confirmed the sale to John Martin and directed the necessary transfers.

On March 31, 1902, there was filed in said court the second annual account of the executors. This account was executed by James B. Burdell and John Coleman, two of the executors, but the names of the three appear thereon, the name of Galen Burdell being signed by James B. Burdell. In this account the proceeds of the sale were accounted for as follows:

Received for 1400 shares Pet. Gas & Electric Co............................$64,000.00
Received for 146 shares Western Refrig. Co. .............................. 1,000.00

On April 14, 1902, an order was made by the court decreeing the account, in all respects as rendered, approved, allowed and settled.

On January 30, 1902, there was filed in the said court a petition for leave to borrow certain moneys and as security for the repayment thereof to execute a mortgage on certain real estate belonging to the estate of the decedent. The petition recited the execution and admission to probate of the will and detailed certain legacies thereunder. Further, it showed other debts which were due, amounting in all to some $130,000. The petition then recites: That in addition to the said legacies mentioned, a devise was made by will of the deceased to James B. Burdell, her son, one of the petitioners, ''of all the shares owned by her at the time of her

death in the corporation known and designated as the Western Refrigerating Company, which shares are referred to in a codicil of the will as now known as the Electric Light and Power Co.," and there was devised to the daughter of the deceased such portion of the Nicasio ranch as should be equivalent in value as appraised in the inventory of the estate to the value of the shares devised to said James B. Burdell. The petition then recites that at the time of the death of Mary A. Burdell, the mother, there were three corporations answering, or in some way answering to the one mentioned in the will and named these as the Western Refrigerating Company, the Petaluma Electric Light and Power Company and the Petaluma Gas and Electric Company. Further the petition recites that it is claimed by James B. Burdell that it was the intent of the testatrix to devise to him the thirteen hundred and ninety-six shares in the Petaluma Gas and Electric Company and that the same are devised by the will but were misnamed and incorrectly described. The said James B. Burdell therefore claims the equivalent in cash to the appraised value of the said shares. The petition is signed and verified by James B. Burdell and Galen Burdell, executors. It is not signed by the remaining executor, Coleman, and the reason appears in the petition itself as follows: "The belief and claim of James B. Burdell is not acquiesced in by John M. Coleman, one of the executors, and also the Guardian of Kathlynne Coleman, a minor interested in the estate, and he therefore has not joined in this petition."

Thereafter all of the parties came together, namely, Galen Burdell, James B. Burdell, John Coleman, executors, the latter being also guardian of Kathlynne Coleman, and the plaintiff Mabel Smith, formerly Mabel Coleman. The last-named Mabel Smith was represented in these negotiations by Leonard Stone, her attorney. As a result of this conference an agreement was entered into between the parties to the effect stated as follows: "In consideration of James B. Burdell releasing and abandoning any claim under the will of any interest in and to any shares in the Petaluma Gas and Electric Company or in the Western Refrigerating Company or the Electric Light and Power Company, and the said Mabel Smith releasing and abandoning any claim under the will to an interest in the Nicasio Ranch equivalent to the value of such shares as shown by the inventory or other-

wise, Galen Burdell agrees to pay to James B. Burdell and to Mabel Smith from the date of the Decree of Distribution, during the term of his, Galen Burdell's natural life, the sum of one hundred dollars per month each.''

This agreement, as far as the record indicates, was fully complied with by all of the parties thereto. Nothing further appears of interest in the probate proceedings down to the decree of final distribution, which decree was preceded, as a matter of course, and record, by the final account, which was duly approved. The decree of final distribution was entered on September 2, 1902, and distributes the property remaining as per the terms of the will. No mention is made in this decree of any of the stocks herein discussed nor is mention made of the life estate of Mabel Smith in the Nicasio ranch.

After distribution of the specific legacies the decree contains the general wording of distribution of any *residuum* to the named heirs, the surviving husband and two children, as follows: ''There is distributed to Galen Burdell, James B. Burdell and Mabel Smith all and singular any property not now known or discovered or not included in any inventory on file which may belong to the estate of Mary A. Burdell, or in which the estate may have any right, title or interest.'' And thus, as far as the record of probate discloses, the Matter of the Estate of Mary A. Burdell, deceased, closed.

The present action was commenced in July of 1925. In the complaint many of the matters hereinbefore detailed are recited and alleged. It is the gravamen of the complaint that there was irregularity in the proceedings involving the sale of the stock and assets of the Western Refrigerating Company. The complaint sets forth and alleges that the sale of the stock of the Western Refrigerating Company was in fact no sale. That no stock of the Western Refrigerating Company was involved in the sale to John Martin. That the defendant James B. Burdell, as the controlling executor, had dominated the remaining executors and made them believe that a sale of the Refrigerating Company's stock had taken place, when, in fact, all that John Martin purchased was the stock in the Petaluma Gas and Electric Company. Further, the complaint alleges the value of the stock of the Western Refrigerating Company to have been worth more than $50,000. Many other allegations are contained, such

as the trust and confidence placed by plaintiff in defendant, his representation to her and her absolute faith in him; likewise, her unfamiliarity with business, and in general all of the so-called classical allegations of a complaint in equity, seeking the creation of a trust in favor of one who has been fraudulently deprived of the benefits of his inheritance.

We pass thus over the allegations of the complaint for the reason that on the trial the plaintiff conceded that her understanding of the facts surrounding the sale were purely on information and belief and beyond her knowledge. The facts as developed, of which hereinafter, came through the testimony of defendant and the court records and on this testimony and records the court made its findings in favor of plaintiff. The plaintiff also pleaded the reasons for her long delay in bringing the action, which reasons will be discussed when we come to the claim of defendant on the point of laches. After the evidence was in the court found the fraud alleged and declared that defendant had by this fraud unlawfully and inequitably come into the possession of assets of the estate of which he was executor, and ordered an accounting. Upon the account being taken, it was found by the court that the plaintiff was entitled to recover from the defendant the sum of $58,672.02 in cash and to have delivered to her by him certain corporation stocks of the par value of $34,900.

The findings of fact are detailed and lengthy and in some instances apparently in conflict and in other instances wholly unsupported by the record and without even the foundation of legitimate inference.

It was argued in the court below as the position of the plaintiff that she would stand on the story of defendant concerning what actually was the transaction between him and Martin, and inasmuch as the trial court adopted in its findings this testimony we will detail the same. As suggested hereinbefore the testimony of Martin was unsatisfactory and indefinite. He testified that he did not know that he was dealing with an executor or that the property involved was in anywise connected with a probate proceeding or subject to the supervision of a court. He testified further that his chief part in the transaction and in all similar transactions was to give personal attention to the securing of the certificates representing the stock with particular note of the

legality and sufficiency of the indorsements. It was shown that the certificates he received were indorsed by the executors as such, thus bringing directly to his attention the character of the transfer. Likewise, he testified that the regularity of the legal steps was entrusted to his counsel and the counsel named were stipulated to be and the fact is they were outstanding members of the California bar at that time. All conceded that they were men of such standing in the profession that they and each of them had and would have a complete familiarity with the details of probate and the statutory requirements accompanying any sale of the assets of a decedent, whose estate was in course of probate. Without further analysis of the testimony of this witness, whose recollection was dimmed by the intervening years, we will, as did the trial court and plaintiff's counsel, adopt, at least so far as was done in the court below, the version given by defendant.

It might be noted here that no claim of any sort is made or involved concerning the shares of stock or the assets of the Petaluma Gas and Electric Company. So far as this record goes, it is conceded that plaintiff makes no claim by reason of any irregularity in this. Therefore the question is confined to the Western Refrigerating Company. It is alleged that the stock and assets of the Western Refrigerating Company were worth the sum of $50,000. The trial court makes no finding on the value. We must presume that official duty was performed and our presumption likewise extends to the regularity of probate proceedings or other ordinary transactions. With this in mind, we have the appraisement return of the stock of the said corporation as $1,000. There was no evidence on values nor is there anything in the record that impeaches the fairness of the appraisement. Indeed, the entire record and the attendant circumstances seem to support it. The executors who turned over the inventory for appraisement were those persons who had been closest to the affairs of Mrs. Burdell in her lifetime and had a close familiarity with her estate. The appraisers, at least one of them, had been theretofore associated in the conduct of the general refrigerating and power business of Mrs. Burdell; Coleman, one of the executors, had a personal interest, as the guardian of his daughter, in having a full and fair valuation placed upon these shares. This by rea-

son of the fact that the life interest in the Nicasio ranch, equivalent in value to the value of these shares, carried a remainder over to the ward, as issue of the daughter Mabel. Also the record develops that the Western Refrigerating Company really owned practically no assets by reason of an extant but not completely executed agreement whereby everything owned by the said corporation was transferred to the Electric Company. In fact, it is conceded and found that the most valuable part of the Refrigerating Company was its goodwill and this finding is made twenty-five years after, when the business had shown that the then goodwill must have had some value.

The plant of the Refrigerating Company was an assembled plant, mostly second-hand, and there is nothing to indicate the volume of business, if any, that was being done. Everything would indicate that the entire business was merely an experiment of an enterprising woman, keen on development of the dairy industry and with refrigeration yet in its infancy.

When John Martin came into the field it was then generally known and was a fact that he was seeking control of the power and light industry throughout that entire region and was in a position to either buy or ruin. He came seeking to buy, rather than being sought after by the executors. His first contact was with James B. Burdell, with whom he had many discussions, mostly bargaining as to the price to be paid. His first offer was $60,000 and it was not until much negotiation that the price was finally agreed upon as $65,000. James B. Burdell took him through the various plants and properties and was continuously insisting that the refrigeration plant was such an integral part of the operating system that a sale of both was advisable and necessary. Martin explained that he had no interest in such a plant nor in the business of eggs, butter or kindred products. Finally, Martin stated that if conceded the necessity of one entire purchase it would mean a total loss to him, inasmuch as he could not run the Refrigerating Company business and could not devote any time or attention thereto. Thereupon Burdell suggested that it might not be a difficult matter to interest someone who would take it over for Martin. In any event, after some bargaining, it was agreed between Martin and James B. Burdell that the

purchase by Martin should include both the Electric Company and the Refrigerating Company and that Burdell would manage and operate the Refrigerating Company, and that as to the Refrigerating Company, Martin and James B. Burdell would be equal partners. Thereafter followed all of the probate proceedings, returns of sale, accounts, etc., as hereinbefore detailed. When the sale to John Martin was confirmed, the stock of the Gas Company was forthwith turned over to Martin. The stock of the Western Refrigerating Company was indorsed by the executors, as far as the stock of the mother was concerned, the remaining shares being indorsed by the parties in whose name they stood, though Mary A. Burdell was the acknowledged owner, and were in possession of James B. Burdell. Nothing was done with this or these stock certificates in the way of delivery. The assets of the Gas and Electric Company followed the stock of that company and John Martin, acting through his corporation, took immediate possession. For a short time the refrigerating business went on as usual under the management of James B. Burdell, defendant, but within a very short time he caused to be opened in his books, or in the books of the company, a partnership account between himself and John Martin. This was pursuant to the agreement or understanding prior to the sale. This partnership paid rent to the California Central Gas and Electric Company, then owner of the premises wherein the refrigerating plant was situate. The partnership continued on for approximately a year and one-half, or thereabouts, when Burdell purchased the interest of Martin. However, it is here to be noted that upon the opening of the partnership books, James Burdell placed into the business under the account of capital investment the sum of $1,000, being credited capital of $500 for each partner. After Burdell had purchased the interest of Martin in the concern for the sum of $3,000, he, Burdell, resurrected the old stock certificates of the Western Refrigerating Company and the corporation went through a process of what might be termed reorganization. The stock-books were reopened and transfers made of the entire stock of James Burdell with sufficient qualifying shares for a directorate. He carried on the business up to approximately 1917, when the same was sold; though portions thereof had been sold at an earlier period. It was

on this state of facts that the trial court determined that a fraud had been accomplished as against the estate of the decedent and against the plaintiff, and ordered the accounting. The court found that the relationship between John Martin and James B. Burdell was knowingly and wilfully fraudulent and in violation of the duty of an executor and that the stock and assets of the Western Refrigerating Company, having been fraudulently obtained from the estate, a constructive trust had arisen in favor of the plaintiff as beneficiary, with the duty of accounting. Incidentally, as defendant phrases it, the findings were fully embroidered and adorned with general findings of fraud and concealment and domination and trust, many of which general findings have not the slightest support in the record. It seems that after fraud was found in the main transaction, that it was taken for granted that all of the *stigmata* were present. For example, it was found that James B. Burdell was the controlling and active factor and "he controlled and dominated the other executors in and about all things found in the premises." Not a word of evidence appears in support of this finding and any inference that might be drawn from the conduct of the remaining executors would negative this finding. To take up each finding and analyze the same would cover hundreds of pages, but throughout fifty pages of findings we find general unsupported conclusions and in nearly all of the specifications of insufficiency of evidence to support the findings, the complaining defendant has sustained his burden. Each attacked finding is so drawn that to point out its weakness would necessitate taking it phrase by phrase, for the reason that a little scrap of fact is taken and polished up with epithets and then builded upon by the addition of the general concomitants of a fraud, whether founded in fact or otherwise. It was found by the court that the transaction with Martin, as a matter of fact was really a sale of the assets of Western Refrigerating Company, which passed with a partnership reservation in the defendant executor. Further, it was found that there was no sale of the stock of the said corporation and that the most valuable of the assets, namely, the goodwill and business, remained inherent in the stock. While upon analysis this construction might work out, yet on its face and from the state of the record, it seems rather

too finely spun. The corporation remained dormant and ceased to function until revived after the termination of the partnership. Whatever business it was capable of doing must have been through its equipment, which was a part of the assets transferred. If it will be assumed, in support of the finding, that the business was done in the name of Western Refrigerating Company, then it might logically follow that it being the name that attracted the business, the success of the venture was attributable to the goodwill incident to that name. However, no evidence supports this construction.

The court's finding that the transfer of the assets was with a partnership reservation, supported the further finding that the transaction was a fraud upon the estate. Likewise, the finding that there was actually no transfer of the stock would have the necessary effect of leaving the stock still undistributed. Let us, therefore, analyze the situation in view of the admitted facts. ■ The stock of the Western Refrigerating Company represented only one four-hundredth part of the entire inventoried value of the estate. Under the terms of the will this stock was a specific legacy to defendant, James B. Burdell. The estate was admittedly solvent and to a healthy degree. The testatrix had been dead for more than one year and her estate had been in probate for over one year. Under these conditions the legatee was entitled to the stock bequeathed him. ■ That the estate of a decedent vests in his heirs or devisees and legatees immediately upon his death cannot be disputed. The legatee does not derive title from the decree of distribution but from the will, which takes effect immediately upon the death of the testator (*Western Pacific Ry. Co.* v. *Godfrey,* 166 Cal. 349 [Ann. Cas. 1915B, 825, 136 Pac. 284], citing many cases supporting the holding).

Let us suppose in the instant case that upon the petition to sell the stock of Petaluma Gas and Electric Company, the defendant James B. Burdell had set forth to the court fully the facts now found. That he had shown the court his ownership and right to the stock as a specific legateee thereof, the solvency of the estate, and its then admitted condition with reference to all of the things now disclosed. Undoubtedly the court would have had the power to sanction the arrangement. Had the court, however, upon closer

scrutiny, determined that it would not be the proper thing to do, then what result would have followed? The court, upon the unquestioned showing made, would have approved the sale of the stock of the Petaluma Gas and Electric Company and refused its approval of the sale of the stock or assets of the Western Refrigerating Company. The situation then would have been exactly the same as though no proceedings or negotiations had taken place with reference to this latter stock. Then let us suppose that Burdell went to Martin and they then had the arrangement here complained of and that Burdell made an assignment to Martin of his stock with the agreement that they would be partners in the business. What possible fraud could be attached to the arrangement? If Burdell had title to this specific legacy, and no claim is made that he did not, he surely could anticipate its full delivery and either sell, assign or give away the stock or any portion thereof that he chose. ▮ Disregarding any of these suppositions, respondents contend that the fact is Burdell did nothing of the sort and it is with the fact alone that we must deal. The gravamen of his offense and the essence of his fraud is that irrespective of the quality of his act the method he chose to bring about the result obtained was fraudulent. We may even concede this, and then immediately arises the pertinent query as to the manner in which the estate or its assets was depleted or in any way affected by this fraud or the manner in or through which this complaining plaintiff was damaged. The law seems well settled that fraud without damage gives rise to no cause of action. (*Holton* v. *Noble,* 83 Cal. 9 [23 Pac. 58]; *Hunter* v. *McKenzie,* 197 Cal. 176 [239 Pac. 1090].)

In the early case of *Patterson* v. *Donner,* 48 Cal., at page 378, it is said: "No man can complain in equity of the fraudulent practices of another, unless he has been injured by such practices." In the more recent case of *Gaffney* v. *Graf,* 73 Cal. App., at page 626 [238 Pac. 1054, 1055], it is said: "It is axiomatic that deceit or misrepresentation without damage does not give a cause of action; that the essential element of an action of deceit or fraud is· the concurrence of both fraud and damage. It has been put in another way, that neither fraud without damage nor damage without fraud is sufficient to support an action." (See,

also, Ruling Case Law, volume 12, page 239 et seq.) With
the application of these principles, we repeat, the damage to
anyone is not apparent. If it is true that a fraud was com-
mitted, the net result was of benefit to the estate in that the
funds purporting to be derived from the sale were actually
turned into the estate; if, on the other hand all of the funds
received were to be credited to the Petaluma Gas and Elec-
tric stock, then all the estate apparently lost was the stock
of the Refrigeration Company, which it held to be distributed
to the defendant. Respondent, however, has anticipated this
conclusion and as far as it goes might concur. But, she
argues, there are two reasons why the argument or the cita-
tions have no application. ■ First, she contends, the
legacy was renounced. On this there is no finding nor was
there any issue made at the trial of a renunciation of the
legacy. Respondent bases this contention upon two excerpts
from the testimony of defendant. One was the statement
of defendant, in reply to a query as to who owned the stock
of Western Refrigeration Company at the time of the Mar-
tin negotiations, that the estate owned the stock. Another
was a statement of defendant that at the time of the death
of Mary A. Burdell this stock was a part of her estate.
Respondent submits these without comment or argument.
Surely, it could not be contended that these two statements
evidenced any renunciation. As a strict matter of fact, dis-
regarding any legal construction, it might be truly said
that every legacy, specific or otherwise, is a part of the
estate and owned by the estate. In any event, it would be
a mere conclusion of ownership and could in no way control
or determine the status of the legacy, or, of itself, establish
a renunciation.

■ The second argument of respondent in this connec-
tion is based upon the stipulation entered into between Mabel
Smith, James B. Burdell and Galen Burdell wherein and
whereby both of the children waived certain claims against the
estate and Galen Burdell agreed to pay to each the sum of
$100 per month during his lifetime. Here it might be noted
that the reason and purpose of the defendant's fraudulent
conduct was determined and found by the court to be for
the purpose of defrauding Mabel Smith out of her life inter-
est in the Nicasio ranch. This necessitates somewhat of a
review of what has gone before. Under the terms of the

will as hereinbefore noted, it was stated that the testatrix gave to James B. Burdell "all of the shares owned by me at the time of my death in the corporation known and designated as The Western Refrigerating Company." In the very next clause it is provided: "I give and bequeath to my daughter Mabel such portion of the Nicasio ranch as shall be *equal in value as appraised in the inventory of my estate* to the value of the shares in the Western Refrigerating Company devised to my son James." It is then argued that the yard stick by which the estate of Mabel was to be measured was the amount that James received from the estate through the stock devised. That if James received nothing from the estate or if he waived his inheritance then the inheritance of Mabel fell *in toto*. It is impossible to see by what forced construction this conclusion is arrived at. The testatrix very carefully avoided the possibility of such a contingency. She herself, familiar as it seems she must have been with the fact that an inventory would be returned in her estate, provided that the means provided by law for determining value should be adopted in determining the values of the respective legacies. The reference to values could in no sense be controlling. If she had provided and named three persons to make the evaluation, the result would have been the same. Or, if she had herself appraised the value of the shares or fixed a valuation thereon there would have been little difference. If instead of either, she had made a direct bequest of $10,000 to James and then provided that there should be cut out of the Nicasio ranch a portion sufficient to equal in value the legacy to James, we know of no rule of law and none is cited to us which even indirectly holds that a waiver of one specific legacy operates to cancel and nullify another legacy to a different person. No claim was made by him to any proceeds from Western Refrigerating Company stock or proceeds thereof. If he prevailed in his claim, it would naturally follow that the values obtained by him would have been the value of the life estate going to the daughter Mabel.

There is not the slightest suggestion of evidence of any representations, misrepresentations or other contact, direct or indirect, made by defendant to plaintiff or to anyone else on the subject. As far as the record indicates he stood

upon that claim opposed by his coexecutor Coleman, and the plaintiff, being represented by counsel in the negotiations.

Galen Burdell, the father, entered into an agreement for the avowed purpose of preventing the threatened litigation and avoiding the possible delay or other troublesome results thereof, whereby he would pay to each child the sum of $100 per month, if James would release and abandon any claim under the will of any interest in and to any share in the Petaluma Gas and Electric Company or Western Refrigerating Company, or Electric Light and Power Company and if Mabel would likewise release and abandon any claim under the will to an interest in the Nicasio ranch equivalent to the value of said shares. This agreement was executed and carried out. The plaintiff, or rather in plaintiff's behalf, it is contended that she would not have executed this agreement if she had known that her brother was then interested as a partner with Martin in the stock or assets of the Western Refrigerating Company, valued at $1,000. The agreement recites that both James and Mabel were in accord with James' claim as to the proceeds of the Petaluma Gas and Electric Company, belonging to James under the will. This brought directly to the mind of plaintiff the claim of James, at least to the extent of the value of the Gas and Electric shares, namely, in excess of $40,000 and possibly to the full $64,000 or $65,000 of the Martin sale. As a matter of record, there is no evidence from which it could even be inferred that defendant Burdell, directly or indirectly or at all, represented or misrepresented to plaintiff that he had received nothing from the Western Refrigerating Company or that he had received anything.

It is apparent from the terms of the codicil that the testatrix intended that the gift to James should include something more than the shares of stock in the Western Refrigerating Company, inasmuch as the said codicil referred to this Company as now being the Electric Light and Power Company. Twice in her codicil, she thus refers to the Western Refrigerating Company and her idea is more evident when in the legacy to the daughter she made provision that the portion of the Nicasio ranch that should be the equivalent of the stock, should embrace a dwelling-house and appurtenances. Even then not much of a dwelling-house could be included in the $1,000 bequest. Therefore, James B. Bur-

dell, under at least some claim of right, as frequently recognized by decisions of courts in the construction of wills wherein there is a misdescription of property devised or persons to whom devised, set up his claim to the proceeds of the sale of the Petaluma Gas and Electric stock as coming within the terms of the bequest. His claim thus presented, if allowed, would have greatly increased the value of the life estate to the plaintiff in the Nicasio ranch rather than depleting her legacy.

It is interesting to here note the only concrete evidence of the denomination and control over the executors alleged to have been exercised by James B. Burdell. The executor Coleman refused to join in this claim and threatened litigation. The only claim of James Burdell was to the proceeds or at least the inventoried value of the stock of Petaluma Gas and Electric Company. It is evident that the estate was not depleted in any way by or through the agreement. The estate, if anything, was enriched to the extent of the withdrawn claim for the proceeds of the sale of the stock. There is not a scrap of testimony that would indicate the value of the Nicasio ranch or the value, if estimated, of plaintiff's life estate therein, save and except the valuation placed thereon by the appraisers, as indicated in the will, namely $1,000. Therefore, the most that could be made of the complaint of plaintiff would be that by reason of the fact that James concealed the fact that he had indirectly, or even directly received a small portion of the claim, she consented to an agreement wherein and whereby she gave up an estate valued at $1,000 for a consideration of her receiving $1200 dollars annually during the life of her father, she being, at the same time, the owner of a remainder over for life after her father's death. The agreement was one binding upon Galen Burdell for the payment of money to each of the children. There is no evidence, one way or the other, that Mabel, the daughter, would or would not have entered into the agreement but for the concealment of the facts by her brother. There is no evidence that she knew anything about the Western Refrigerating Company's stock or its value. There is no evidence that she relied upon any representation or misrepresentation. In fact, there is no evidence at all forthcoming from the plaintiff Mabel. She was not called as a witness nor was her deposition offered. No account was

made for her absence and in view of the entire case there can be nothing but the remotest inferences concerning what she knew or believed at the time.

This concludes our view of the first part of the case. It is our opinion that it is not a case where the allegations of actionable fraud have been sustained in any particular. It may be that testing the transactions by all of the rigid rules governing, there was an irregularity of procedure and that the defendant secured what actually belonged to him in a manner that might have been better had he awaited the distribution of the estate. But the claim of plaintiff is predicated wholly as an heir to funds of the estate held in trust by the defendant. We hold this claim not supported by the record.

In *Ryder* v. *Bamberger*, 172 Cal., at pages 799 and 800 [158 Pac. 753, 756], it is said: "If there be two inferences equally reasonable and equally susceptible of being drawn from the proved facts, the one favoring fair dealing and the other favoring corrupt practices, it is the express duty of the court or jury to draw the inference favorable to fair dealing. (Citing cases.) For fraud must always be proved, so that when the plaintiff's case goes no further than to establish a case from which the inference of fraud may or may not be drawn he has failed to establish his charge by a preponderance of the evidence and it becomes the duty of court or jury to find in favor of uprightness and innocence. This, of course, does not mean that the fraud must be proved by direct evidence. This is not always nor even often, possible, but it does mean that the indirect evidence and the inference to be drawn from the proved facts must be so convincing as to satisfy court or jury that fraud was designed and accomplished."

We are mindful, too, of the disfavor with which a court of equity looks upon anything savoring of fraud. The prevention of fraud and the integrity of trust relationship have been subjects of many learned opinions in chancery. Down through the ages have come the scathing denunciations of the learned chancellors against those who by fraud and deceit overcome the trust and confidence of their *cestui que trust*. Epics have been written on the power of equity to relieve those distressed through violation of confidential relations. But in no instance has equity ever wavered in

its holding that fraud would not be presumed in the absence of evidence. Equity itself has its foundation in man's honesty of purpose and for its continuance it must rely upon the presumption that this continues. For if ever it were a presumption to be indulged that all men were dishonest, not only courts of equity but all law would fail.

The next important point is the question of laches, raised by the appellant at every stage of the proceedings and found against him on each occasion by the court.

■ Preliminary to a discussion of this phase of the case we take up the respondent's claim that all questions of laches and limitation were stipulated out of the case. As much stress is placed upon this stipulation and the facts surrounding the same, and as there was a finding by the court that the stipulation did take the question of laches out of the case, which said finding embraces a one-page sentence, it becomes necessary to detail the circumstances and the stipulation. It was claimed on behalf of plaintiff that she first was put upon suspicion by an event that happened in 1924, in the course of the settlement of her father's estate. There was an item in the father's estate referred to as the Howard note. Defendant, James B. Burdell, was the executor of the estate of Galen Burdell. It was claimed that when the account of the executor came on for settlement, it was represented that the Howard note was an asset of no value. This representation was made in the account of the executor and his account charged with a small sum of ten dollars on account of the said note. It was claimed by the attorneys representing plaintiff in the estate matter that the face value of the note, namely, $1200, had in fact actually been received by a dummy to whom the note had been assigned. The controversy coming on to be heard in open court, before the hearing or at the hearing, the defendant, who was executor of the estate of Galen Burdell, made admission of the amount due the estate and paid in the $1200. When, in the instant trial, this subject was opened up, a colloquy between court and the respective counsel ensued:

"Mr. Henshall (counsel for plaintiff): Of course, I do not know the peculiar form in which the admission is made. I should not be misled or trouble these witnesses again by ordering them back. I do know by this admission, and

I so claim it, and will now claim it so it may be denied, that after Mr. Meyer had settled the Howard note, which theretofore had not been known to the plaintiff, that for the first time her suspicions were aroused and as a result of an investigation for the first time she became aware of the alleged cause of action set up. This is my understanding of the admission.

"Mr. Brittain (counsel for defendant): We are perfectly willing to stand on that, reserving the right to argue the facts in regard to matters antecedent to that time relating to matters in issue in this case. We will not contest anything about the Howard note because it is entirely immaterial and will be settled according to the statement of counsel. We will not question as to whether there was a foundation for Mrs. Lichtenberg's suspicions by reason of the Howard note. It does not make any difference what aroused her suspicions, as your Honor has well said, if she had suspicions, and if she thereafter made a discovery and brings herself within the rule of law putting the burden upon her of making discovery promptly of frauds, we will not make any question about that, we will not raise any questions as to the suspicions which she alleged she had. I do not know if I can go any further in an admission. It seems perfectly clear.

"The Court: I think with those admissions before us it will not be necessary to go into the details of the settlement of this account of 1924.

"Mr. Henshall: I do not think we should go into any of these matters at all. If it is admitted her suspicions were aroused in 1924, why trouble ourselves."

A fair reading of this so-called stipulation will readily convince one that all that was involved was the question of whether or not the plaintiff's suspicions were aroused by this transaction surrounding the Howard note. The very last statement of counsel for plaintiff indicates that he so understood it. The careful statement of the counsel for appellant does not indicate any waiver of the questions of limitation and laches. It is a most appropriate place for the application of the old maxim that he who sticks on words, sticks in the bark. The language used must be stretched and distorted out of all proportion to get from it the meaning given by respondent. Granting that it was

admitted that the plaintiff's suspicions were aroused at this time does not remove from her the duty of diligence and watchfulness, nor does it impose upon the courts any additional duty to disregard the wholesome laws and rules enacted to prevent the inquiry into stale claims and demands.

We conclude that the point of limitations and laches was not taken from the case but still remains, and as will be disclosed hereinafter, bars the plaintiff's action.

■ The transactions around which the action centers occurred some twenty-four years before action brought. During all of this time the plaintiff was of the age of majority and not under any legal disability. As the evidence discloses, for many years she was the active manager of a ranch of some four or five thousand acres in close proximity, territorially, to the place wherein the defendant was conducting the business of the Western Refrigerating Company. The books of the company at the very outset showed the existence of the partnership and at all times the defendant was in the actual management and control thereof. The record further shows that in the conduct of the said business the defendant purchased cream and dairy products from plaintiff and was friendly with her. The record further shows that the father of both plaintiff and defendant was on the usual terms of family intimacy with each of the children and that social visits were exchanged between all of the families. That defendant was held out in the city of Petaluma as the active owner of the refrigerating company and its allied activities. That the father knew of the partnership, at least after it was formed, speaking of the original partnership between Martin and the defendant. This appears from the undisputed testimony that the father advanced to defendant the money, or a part thereof, with which defendant purchased the interest of Martin. The plaintiff for more than twenty years was a close personal friend of John Martin, and Martin was often a visitor at the home of plaintiff and her husband. That plaintiff had, at all of the times mentioned, independent advice and counsel, inasmuch as throughout the original proceedings she was represented by counsel. The record further shows without dispute that the business was conducted in a small city and within the knowledge of anyone who cared to become interested to ascertain any of the facts connected

therewith. The record discloses no act, representation or misrepresentation of defendant, other than the solitary fact that he did not directly in so many words or at all give to plaintiff any of the facts surrounding the transaction in the original estate matter. Further than this, it is undisputed that all of the principals who could throw any light upon the subject have died. Galen Burdell, the father, died in 1906; Leonard Stone, attorney for Mrs. Lichtenberg, plaintiff, is dead; the attorneys who represented Martin and who made fullest investigation of the affairs attending the transfer of the stock, and to whom was entrusted exclusively this matter, are all dead. And chiefly to be noted is the fact that the plaintiff herself was not a witness nor did she present any testimony on her own behalf as to what her knowledge might have been or what facts she knew. All that is presented to overthrow the claim of laches is that twenty-five years after the fraud alleged was perpetrated, the plaintiff felt that she had been defrauded in a transaction then occurring, and thereby her suspicions were aroused and she made investigation. No record appears as to what this investigation was or what facts were discovered thereby or why, if at all, these facts could not have been discovered before. The final and ultimate test of what was operating in the plaintiff's mind and indisputably the best evidence on that subject, and evidence that was easily available to plaintiff, was her own statement on the subject. The only finding that would support her case is that she believed from what she had heard, presumably from the record of the court proceedings, as no evidence of any representations by defendant or others on his behalf appears, that there had been a sale and she took it for granted that this was the case. If the doctrine of laches has not its fullest application here it is difficult to determine what the doctrine means or when, if ever, it can be applied. It is to be noted also that the defendant does not rely entirely if at all upon the strictly equitable definition of laches. He asserts, and has asserted at every stage of the proceedings, the bar of the statutes of limitation. ▮ Statutes of limitation are statutes of repose and designed to bring about peace and harmony.

The doctrine of laches is founded, not on a concern particularly as to individual rights, but as a matter of public

policy. At a very early period in the history of the law, statutes were enacted to prevent the pursuit of stale demands and to bar recovery thereon. Only where it is apparent that a fraud will result and injustice follow have the courts of equity relaxed. And this does not appear here. It is doubtful if the reports will disclose any case wherein a plaintiff has been able to invoke the aid of a court of equity after a delay of twenty-five years upon no greater showing than that he did not have occasion to mistrust defendant until after a lapse of such great time and without the plaintiff offering any testimony concerning his knowledge or lack of knowledge prior to the time of the arousal of these suspicions. If the doctrine of laches is founded on a public policy and the preservation of the general good, it may be wondered just how far consistent with the general good it might be to hold that the doctrine did not apply in a case where the facts are as hereinbefore detailed.

In the instant case, with no showing of diligence, with ample opportunity to know and almost positive knowledge that the defendant was operating the business involved, and dealing with him herself in this business, all that the plaintiff offers to justify a delay of almost twenty-five years is the fact that after she became convinced in 1924 that the defendant was unfaithful to his trust in another family matter it dawned on her that perhaps all was not well some twenty-five years back. It may be reasonably asked just why did she pick out for investigation this particular transaction of the Western Refrigerating Company stock. The obvious answer, in the absence of further testimony forthcoming from her, is that all of the time she knew that he had operated and carried on this business as his own, without account to her or to anyone else on her behalf or on behalf of the estate of the mother. The only reason for her suspicion lighting upon this particular transaction must have been a prior knowledge or at least reasonable grounds of doubt on the integrity of that particular transaction. How would she, or anyone else, without knowledge or facts, out of an estate of some $400,000 immediately light upon this obscure item, out of a clear sky? More than seven periods of limitation had elapsed. The right of action was given to plaintiff within a period of three years after the

discovery of the fraud. It was not incumbent on the defendant to prove that plaintiff had not discovered the fraud or that she had not discovered facts sufficient to compel her investigation. The right accorded plaintiff was an exceptional one and upon her devolved the duty and burden of bringing herself within the exception as an essential part of her cause of action. Defenses based upon statutes of limitation are meritorious defenses and the defense of laches is a favorable defense in equity. As we have held hereinbefore, the fraud alleged was more of an irregularity than a positive fraud; it involved a small portion of a large estate and involved a portion which of right belonged to the defendant. The irregularity, or fraud, if it might be so termed, was acquiesced in by the other member of the family, the father, with full knowledge. If the judgment of the lower court can be upheld, it would mean chaos in the courts and in society at large. Every heir or legatee, after twenty-five years or fifty years, could come forward with a complaint to the effect that but recently he had cause to suspect something wrong, not about the original probate, but concerning the honesty of the executor or a coheir and without the necessity of making any showing as to what his own knowledge had been through the intervening years, seize upon something that perhaps he had been carefully nursing for many years and demand relief. Business would become necessarily unsettled and affairs generally in a state of havoc.

 In the case of *Kleinclaus* v. *Dutard*, 147 Cal. 251 [81 Pac. 516, 517], it is said, quoting from Story's Equity: "Where time and long acquiescence have obscured the nature and character of the trust or the acts of the parties, or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief upon the ground of lapse of time and its inability to do complete justice. This doctrine will apply even to cases of express trust." An all-sufficient reason for the application of the doctrine, as announced in the case just cited, was the impossibility of doing complete justice between the parties. Such a condition is present here. The business had been discontinued since 1917 and a large part thereof discontinued since 1912. Books of account were missing and the evidence of income or expenditures almost

wholly conjectural. All in all, there is no appeal to a court of equity in a demand for more than $100,000 arising out of a technical trust alleged to have been involuntarily created some twenty-five years ago, involving a sum of $500, and particularly where the actual state of mind or knowledge on the part of the plaintiff is withheld.

In our opinion the judgment should be reversed, on the appeal of the defendant. This leaves nothing further to be done in respect to the appeal of the plaintiff. The judgment is not reversed on the plaintiff's appeal and obviously it cannot be affirmed on that appeal. In its entirety the judgment is reversed and if express order is necessary it is ordered that for all intents and purposes the judgment, being reversed, no longer serves as the basis for any claim on behalf of plaintiff.

Tyler, P. J., and Knight, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 30, 1929, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 29, 1929.