[Civ. No. 27960.   Second Dist., Div. Three.   Nov. 3, 1965.]

ALFRED W. PERRY et al., Plaintiffs, Cross-defendants and Respondents, v. JAMES H. BEDFORD et al., Defendants, Cross-complainants and Appellants.

Arthur E. Briggs for Defendants, Cross-complainants and Appellants.

Richard E. Erwin for Plaintiffs, Cross-defendants and Respondents.

THE COURT.—Appeal from judgment of specific performance of conditional land purchase contract.

For convenience, Alfred W. Perry and Anna Mae Perry, husband and wife, will be referred to herein as plaintiffs or plaintiff, as the case may be, and James H. Bedford and Ruby M. Bedford, husband and wife, will be referred to herein as defendants or defendant, as the case may be.

Defendants were the owners, since 1942, of a tract of land

situated within the city limits of the City of Glendale, consisting of approximately 7 acres. There was a house on the property at the time of purchase which they repaired, moved into, and occupied as a residence. On or about July 27, 1953, the defendants decided to subdivide the 7-acre parcel. Application for subdivision was made by defendant James H. Bedford and a tentative subdivision map was filed with the planning department of the City of Glendale which was finally approved and recorded in the offiffice of the County Recorder of Los Angeles County as Tract 19561. According to the subdivision map the acreage was divided into five parcels, designated Lots 1 to 5. Defendants' house is situated on Lot 1 of the subdivision. In June of 1954 plaintiffs and defendants entered into a written contract whereby the plaintiffs agreed to purchase and the defendants agreed to sell Lot 2 of this tract together with a house to be constructed thereon by defendants for the sum of $14,950, payable $1,000 in cash upon the execution of the contract, and the balance in monthly installments of $100 or more beginning July 12, 1954. The contract further provided that when the buyers had reduced the principal amount by not less than $4,000, then and in that event the sellers would give to the buyers a good and sufficient grant deed, taking back a new note secured by a first deed of trust for the balance, payable monthly at the rate of 1 per cent of the principal then outstanding, including interest of 6 per cent per annum on the unpaid balance. The contract further provided that concurrently with its execution the buyers would execute and deliver to the sellers a quitclaim deed to the property which the sellers would hold pending performance of the contract, and which the sellers were authorized to record at any time the buyers were in default and failed to remedy such default after 30 days' written notice. The buyers were to have possession of the property under the terms of the contract.

Lots 1 and 2 of the tract lie next to each other, so that the most southeasterly boundary of Lot 1 constitutes the most northwesterly boundary of Lot 2.

When the subdivision was laid out, the City of Glendale, by ordinance, required that every lot should have frontage on a dedicated street. Consequently, the final map of the subdivision as approved and recorded laid out a dedicated street running generally in a northeasterly direction from Chevy Chase Drive to a cul-de-sac, circular in form. Lots 1 and 2 fronted directly upon the cul-de-sac. Lots 3, 4 and 5 were

given access to the cul-de-sac by what appears on the subdivision map to be long chimneys running parallel with their frontage and over a 40 foot easement granted to the city for sanitary sewers, drainage and public utilities. A private road had been constructed by defendants within the area of this easement, over which practical access from the cul-de-sac to Lots 2, 3, 4 and 5 was provided. According to the official map, access to the cul-de-sac from Lot 2 was provided by a neck of land approximately 15 feet wide and 42 feet long, extending from the southwesterly corner thereof to the cul-de-sac. It is the right to the title to this parcel that is in dispute. Both sides agree that this neck does not provide practical access to Lot 2, and therefore it is referred to sometimes as a "technical corridor" or a "technical frontage."

By March 13, 1961, plaintiffs had performed all the obligations under the conditional contract of sale on their part to be performed in order that they could demand a grant deed from the sellers. On this date the parties entered into an escrow at the Security First National Bank for the purpose of carrying out those provisions of the conditional contract relating to the transfer of title to the plaintiffs and their giving a promissory note secured by a first deed of trust for the balance due. This escrow was never closed for the reason that defendants claimed title to the technical corridor and would not authorize the delivery of the grant deed which they had deposited in the escrow and which contained the legal description of the property by reference to the recorded map.

On April 18, 1961, plaintiffs filed their action seeking specific performance of the conditional contract of sale. Defendants set up in their answer the defense of mutual mistake in the execution of the conditional contract of sale; title by prescription to the technical corridor; and failure of consideration. The defendants also filed a cross-complaint and a first and second amended cross-complaint. In the last-named pleading they sought to quiet their title in the disputed area; claimed title by prescription; and asked for reformation of the conditional contract of sale on the ground of mutual mistake in its execution. The court rendered judgment in favor of plaintiffs, directing the defendants to specifically perform the conditional contract of sale; to deliver to plaintiffs a good and sufficient grant deed to Lot 2; to otherwise comply with the terms of the escrow that had been opened and to which they had agreed; and that defendants and cross-

10

complainants take nothing by reason of their cross-complaint.

Defendants assign four errors upon which they seek reversal of the judgment.

(1) They assert that the trial court erred in rendering judgment of specific performance because the evidence shows that the conditional contract of sale was executed under a mutual mistake of fact as to the land intended to be conveyed under its provisions. ▮▮▮ We have examined the record in this connection, and while there is testimony on behalf of defendants which might support this view, there is also contrary testimony on the part of plaintiffs that the boundaries of Lot 2 were never pointed out to them by the real estate broker who represented the defendants in the sale; that they saw no stakes on Lot 2 which would indicate that they were purchasing the lot minus the area delineated on the official map and referred to in the testimony as the "technical corridor." Plaintiff Mrs. Anna Mae Perry testified that she didn't know where the boundary lines were; all that she knew was that they owned Lot 2. She testified further that about the time they were entering into the escrow she told the defendant James H. Bedford, " 'When we go through escrow I would like to have a surveyor come out and just show us exactly where our boundary lines are.' " Plaintiff Alfred W. Perry testified that no mention of boundaries was made at the time of purchase and that he first learned of the neck of land being part of Lot 2 when he saw a map showing it about two years after they had moved onto the property. The testimony disclosed that plaintiffs moved onto the property some time in October of 1954. He further testified that about half a year after moving onto the property, the following discussion took place between himself and defendant James H. Bedford, about the boundaries of Lot 2: "A. I asked him, I says, 'I would like to know where this line is,' and he says— Q. What do you mean by 'this line'? A. A Line along the side of the garage on the Lot 3 side. Q. This line? A. The Lot 3 side. He evaded the answer. I said, 'I don't want any arguments with any of the neighbors, I don't want to be planting on any of their property and I want to know.' He said, 'We don't want anybody up here that is going to argue over a property line.' He said he didn't want to split lines over property lines, he didn't want anybody to split lines over property. He said, 'Just let it go.' I said, 'I don't want to argue with any of my neighbors,

want to keep peace with everybody, but I want what is coming to me.' I thought then I will wait till I get it surveyed and I will find out everything.''

Where one seeks to reform a written instrument he must establish by clear and convincing evidence that the objectionable language found in the instrument was the result of mutual mistake by the parties (*Moore* v. *Vandermast, Inc.,* 19 Cal.2d 94 at p. 97 [119 P.2d 129]), and whether defendants did so establish this was a question for the trial court (*Pluth* v. *Smith,* 205 Cal.App.2d 818 at p. 823 [23 Cal.Rptr. 550]). A contract cannot be reformed solely because one of the parties made a mistake (*Meyerstein* v. *Burke,* 193 Cal. 105 at p. 109 [222 P. 810]; *Baines* v. *Zuieback,* 84 Cal. App.2d 483 at p. 489 [191 P.2d 67]). We find little evidence in the record to show that plaintiffs were mistaken as to the boundaries of Lot 2 at the time the conditional contract of sale was entered into and there is no evidence tending to show that plaintiffs knew prior to the date of the escrow that defendants had made a mistake in not excluding from the conditional contract of sale and the deed which had been deposited in escrow the land within the disputed area.

There was ample evidence in the record to support the trial court's finding that there was no mutual mistake as to the legal description of the land as it was set forth in the conditional contract of sale.

Defendants further urge that specific performance cannot be enforced against a party to a contract if it is not as to him just and reasonable (Civ. Code, § 3391, subd. 2; *Jacklich* v. *Baer,* 57 Cal.App.2d 684 [135 P.2d 179]). In *Jacklich,* the court said (p. 693): ''Equity will not lend its aid to enforce contracts which upon their face are so manifestly harsh and oppressive as to shock the conscience; it must be affirmatively shown that such contracts are fair and just.'' The evidence before the trial judge justified a finding that to grant specific performance would not compel an act which would be so manifestly harsh and oppressive as to shock the conscience, and that the result of the judgment would be just and reasonable as to all parties.

Defendants urge that specific performance should have been denied on the ground of injustice to third parties. This argument is based on the premise that plaintiffs will have the use of the technical corridor as well as the private road, whereas the owners of Lots 3, 4 and 5 will only have use of the private road. Defendants do not make it clear just how

12

inequity can arise from a situation where plaintiffs will receive what they bargained and paid for under a contract to which the other lot owners were not parties, and where it was never contemplated that the other lot owners would acquire an interest in the technical corridor of Lot 2.

Defendants assert that specific performance should have been denied where it would be of little benefit to plaintiffs and would work serious injury to defendants, citing *Herzog* v. *Atchison, Topeka etc. R.R. Co.*, 153 Cal. 496 [95 P. 898, 17 L.R.A. N.S. 428]. During the trial, the trial judge viewed the premises, and after such view he commented: ''You see, gentlemen, we were out there yesterday and while I am not an expert on land values at all, to me that little disputed corridor represented little, if any, value to the Perrys. On the other hand, in view of the situation of the Bedford lot, it was quite a convenience for the Bedfords, for them to have that particular strip. Financially or moneywise I don't think we are arguing over a great deal of money, are we?'' There is a vast difference between depriving one of a mere convenience and working serious injury to him, and the trial judge was justified, under the evidence, in finding that a judgment of specific performance would not inflict serious injury upon the defendants.

Defendants urge that the trial court should have found in favor of their defense based upon equitable laches, citing *Kleinclaus* v. *Dutard*, 147 Cal. 245 [81 P. 516] and *Marsh* v. *Lott*, 156 Cal. 643 [105 P. 968]. ▉ There is no precise rule as to the lapse of time or circumstances which will justify the application of the doctrine of laches. Each case as it arises must necessarily be determined by its own circumstances. '' '. . . the question is addressed to the sound discretion of the chancellor. . . .' '' (*Kleinclaus* v. *Dutard, supra*, at p. 249.) *Marsh* v. *Lott, supra*, cited and relied on by defendants, is not in conflict with this principle. ▉ We find no abuse of discretion on the part of the trial judge in not applying the doctrine of laches to the facts disclosed by the record.

(2) Defendants assert that the trial court committed error in denying their plea for reformation of the conditional contract of sale. As heretofore pointed out, reformation, under the circumstances here shown, may be had where the mistake was mutual; the mistake of one is not sufficient. ▉ This court may not set aside the finding against mutual mistake

when such finding is supported by the evidence. Furthermore, had the court granted reformation, this would have resulted in splitting Lot 2 in such manner as to deprive it of frontage on a dedicated street, in violation of a city ordinance of the City of Glendale requiring every lot to have such frontage.

(3) Defendants urge that the trial court erred in rendering judgment against them on the second count in the second amended cross-complaint wherein they sought to establish title by prescription in the disputed area.[1] The testimony in this connection showed that since the execution of the conditional contract of sale, the defendants pruned and sprayed trees on the area in controversy; weeded and watered the area; killed birds and gophers that were destroying vegetation; and installed a hydrant to which they connected a soaker. Defendant James H. Bedford chopped down an acacia and a walnut tree. The walnut tree was cut down at the request of plaintiff Alfred Perry as it was obstructing his view. Defendant James H. Bedford would occasionally sit under the trees and take a sun bath. Defendant Ruby M. Bedford testified that she had done most of the work of planting and caring for the shrubs because of her husband's illness; that she had planted ivy and strawberries on the berm and slopes of the disputed area to prevent erosion. Plaintiff Alfred W. Perry testified that after he and his wife moved onto Lot 2 he observed the defendants at work planting on the disputed area. When asked if he thought they were doing this because of their ownership of the area, he answered he didn't know; that had he known that defendants claimed ownership he would have objected to their activities; there was no reason to object at that time; he testified that the defendant James H. Bedford "never showed us any map of our layout. I have asked him about our property lines and he couldn't—he never did; he just kind of evaded it." He testified further that there were some trees on the disputed corridor when he moved onto the property; that they grew wild there; that about 1957 he discovered that the disputed area was included within the legal description of Lot 2 but did nothing to stop the activities of the defendants in caring for the trees and shrubs thereon because he didn't want to

[1]Civil Code, section 1007: "Occupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar any action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all. . . ."

14

get into a fight. Plaintiff Mrs. Anna Mae Perry testified that after they discovered that the disputed area was included in the legal description of Lot 2, she and her husband went on the property two or three times; planted some ivy, and watered it.

No case has been brought to our attention, and we have been unable to find one, bearing on the right of a conditional vendor under a land sales contract to assert adverse possession against his conditional vendee while the contract remains executory. It is said: "The possession of the vendee of land under an executory contract of sale is presumed to be in subordination to the rights of his vendor so long as the purchase price has not been paid or the contract is otherwise unperformed on his part, while, by the weight of authority, so soon as he has completely performed his part of the contract, his possession becomes adverse to the vendor, notwithstanding the invalidity of the contract, as it does, even before performance by him, if he explicitly repudiates holding under the vendor." (4 Tiffany, Real Property, 3d ed., pp. 521-522; See also 2 C.J.S., Adverse Possession, § 121, p. 672; *Woodward* v. *Hennegan*, 128 Cal. 293, 299 [60 P. 769].)

As between a grantor and grantee, it has been held that " 'By the execution and delivery of a deed of land the entire legal interest in the premises vests in the grantee, and if the grantor continues in possession afterward his possession will be either of tenant or trustee of the grantee. He will be regarded as holding the premises in subserviency to the grantee, and nothing short of an explicit disclaimer of such relation and a notorious assertion of right in himself will be sufficient to change the character of his possession and render it adverse to the grantee.' " (*Gernon* v. *Sisson*, 21 Cal.App. 123, 127-128 [131 P. 85]; *Merritt* v. *Rey*, 104 Cal.App. 700 at p. 707 [286 P. 510]; *Belli* v. *Bonavia*, 167 Cal.App.2d 275 at p. 281 [334 P.2d 196].) As between a grantor and grantee, the grantee is in a position to assert his title as against any claim of his grantor. As between a conditional vendor and vendee, the conditional vendee is not in a position to assert title as against his conditional vendor so long as the contract remains executory. If a grantor, who remains in possession, may not claim adverse possession as against his grantee, in the absence of an explicit disclaimer of such relationship and a notorious assertion of the right in himself, it would seem reasonable that the same rule should be applied as between a

conditional vendor, who remains in possession, and his conditional vendee while the contract remains executory. The latter, it would seem, is entitled to the same protection as the former, and because of his disability to assert title in himself, is much more in need of such protection.

In the case at bench, the trial court was justified in finding that the defendants' conduct on the disputed area, a substantial part of which was planting to prevent erosion of the land and therefore to prevent waste, coupled with their failure to delineate the boundaries of Lot 2 when asked to do so, was not such an explicit disclaimer of their relationship with plaintiffs and such a notorious assertion of their right as to set the statutory period in operation respecting their right to claim adversely to their conditional grantee while the contract remained executory, and that the first explicit disclaimer on the part of defendants bearing on their relationship to plaintiffs with respect to the disputed area occurred when the defendants placed a stop order in the escrow of March 13, 1961, thus preventing delivery of the grant deed which they had deposited therein.

(4) Defendants complain that the findings of fact are at variance with the pleadings and are not supported by the evidence, and that the conclusions of law and the judgment are against the law and the evidence. The findings are by reference to a great many paragraph numbers in the complaint, the answer to the complaint, the second amended cross-complaint, and the answer to the second amended cross-complaint, which makes them most difficult to follow. The better practice, we believe, is to recite specifically those matters found to be true which determine the controverted material issues necessary to sustain the conclusions and judgment. We have examined the findings, conclusions and judgment, and we are unable to find such claimed infirmities therein as would warrant setting aside the judgment.

The judgment is affirmed.

A petition for a rehearing was denied November 17, 1965, and appellants' petition for a hearing by the Supreme Court was denied January 12, 1966.