[S. F. No. 3857.  In Bank.—June 26, 1905.]

THEKLAY DUTARD KLEINCLAUS, Administratrix, etc.,
et al., Appellants, v. ELIZA DUTARD et al., Respond-
ents; and JOSEPH T. O'CONNOR, Administrator, etc.,
Cross-Complainant, Appellant.

ACTION TO ENFORCE VERBAL TRUST—LACHES—DEMURRER TO COMPLAINT.
—In an action by surviving heirs of a deceased father to enforce
an alleged verbal trust declared thirty-five years before by a
deceased son in favor of his father's heirs, where the complaint
shows on its face that the cause of action against the administrator
of the deceased son is barred by the laches of the plaintiffs, the
defense of laches may be raised upon general demurrer to the
complaint.

ID.—LONG ACQUIESCENCE IN HOSTILE ACTS—GOOD FAITH AND DILIGENCE
NOT SHOWN—CONSTRUCTION OF PLEADING—PRESUMPTION.—Where
the complaint shows great lapse of time without the assertion of
any claim, and long-continued acquiescence in acts of the alleged
trustee hostile to the plaintiffs' claim, and does not allege circum-
stances showing good faith and diligence on the part of plaintiffs,
the complaint must be construed most strongly against the pleader,
and it must be presumed that they do not exist.

ID.—STALE DEMANDS—INEXCUSABLE DELAY—LACHES IN CASE OF EX-
PRESS TRUST.—Stale demands will not be aided where the com-
plainant has slept upon his rights for so long a time, and under
such circumstances as to make it inequitable to enter upon an inquiry
as to the validity thereof.   Where inexcusable delay is shown,
consideration of public policy and the difficulty of doing entire
justice obtain; and the doctrine of laches may be invoked in every
class of cases, even in the case of an alleged express trust.

ID.—AVERMENT OF CONTINUED VERBAL ACKNOWLEDGMENT—WANT OF
EQUITY IN COMPLAINT AS A WHOLE.—In determining the sufficiency
of the complaint, the whole of its averments must be taken to-
gether, and an averment that the deceased son always during his
lifetime verbally acknowledged the trust and never repudiated it
is not conclusive where it appears that the complaint as a whole
presents a case in which all of the acts of the alleged trustee had
been openly and notoriously hostile to the claim of the plaintiffs;
and taken altogether the case is clearly one where a court of equity
is justified in refusing on the ground of laches to even enter
upon an inquiry as to the merits of the claim.

ID.—SUSTAINING OF DEMURRER—REFUSAL TO ALLOW AMENDMENT—DIS-
CRETION.—Where the demurrer to the complaint was sustained, the
court did not abuse its discretion in refusing to allow an amendment
of the complaint, where the record does not show in what manner
plaintiffs desired to amend or that they specified the nature of
the proposed amendment.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Knight & Heggerty, and T. C. Coogan, for Appellants.

Laches cannot be invoked because of the continued acknowledgment of the trust. (*Plass* v. *Plass*, 122 Cal. 3, 14, 16, 54 Pac. 372; *Odell* v. *Moss*, 130 Cal. 352, 358, 62 Pac. 555; *Odell* v. *Moss*, 137 Cal. 542, 545, 70 Pac. 547; *Butler* v. *Hyland*, 89 Cal. 578, 581, 26 Pac. 1108; *Faylor* v. *Faylor*, 136 Cal. 92, 96, 68 Pac. 482; *Zuck* v. *Culp*, 59 Cal. 142; *Parks* v. *Satterwaite*, 132 Ind. 411, 32 N. E. 82.)

Bishop, Wheeler & Hoefler, and William Rix, for Respondents.

The complaint upon its face shows a want of equity, and that the alleged cause of action is barred by laches. (*Harris* v. *Hillegass*, 66 Cal. 79, 4 Pac. 987; *Hecht* v. *Slaney*, 72 Cal. 362, 14 Pac. 88; *Bell* v. *Hudson*, 73 Cal. 285, 287, 288,[1] 14 Pac. 791; *West* v. *Russell*, 74 Cal. 544-549, 16 Pac. 392; *Chapman* v. *Bank of California*, 97 Cal. 155-159, 31 Pac. 896; *Seculovich* v. *Morton*, 101 Cal. 673, 676, 677,[2] 36 Pac. 387; *Robertson* v. *Burrell*, 110 Cal. 568, 577, 42 Pac. 1086; *Bills* v. *Silver King Mining Co.*, 106 Cal. 9, 39 Pac. 43; *Burling* v. *Newlands*, 112 Cal. 476, 500, 502, 44 Pac. 810; *Simpson* v. *Dalziel*, 135 Cal. 599, 67 Pac. 1080.)

ANGELLOTTI, J.—This action was brought to obtain a decree establishing that all of the property possessed by Hyppolite Dutard at the time of his death was the property of the estates of his deceased father and mother, Bernard Dutard and Joaquina Dutard, held in trust by him for their heirs at law. The plaintiffs are a brother and sister of said Hyppolite Dutard, and the said sister is administratrix of the estates of the father and mother. The sister claims, as heir at law, to be the beneficial owner of an undivided one-fifth part of said property. The defendants are the executors of the will of said Hyppolite, his surviving wife, the administrator of the estate of Joaquina Dutard Labadie, a deceased sister, and the children of a deceased brother and another deceased sister. A

---

[1] 2 Am. St. Rep. 791 and note.      [2] 40 Am. St. Rep. 106.

demurrer was interposed to the second amended complaint
by the representatives of the estate of Hyppolite and other
defendants, and this was sustained without leave to amend.
The defendant administrator of the estate of Joaquina La-
badie filed a cross-complaint, containing substantially similar
allegations to those of the complaint, claiming an undivided
one twelfth of the property. A demurrer interposed by the
other defendants to this cross-complaint was sustained. Judg-
ment was thereupon entered in favor of the demurring de-
fendants against plaintiffs and the administrator of the estate.
of Joaquina Labadie. From this judgment both the plaintiffs
and the administrator of the estate of Joaquina Labadie ap-
peal.

The allegations of the amended complaint present a most
remarkable case. Substantially and so far as is material here
the case is as follows, viz.: At the time of his death, October
13, 1865, the father, Bernard Dutard, was the owner of a
small produce and commission business in San Francisco, the
value of the same and the property thereof being fifteen thou-
sand dollars, which was the community property of said Ber-
nard and his wife, Joaquina. He died intestate. Upon the
death of his father, Hyppolite, then a young man of the age.
of about twenty years, in accordance with the expressed wish
of his father, assumed the control of said business. His father
had requested him ''to continue after his death to carry on
and conduct the said business and manage the property there-
of for his mother, sisters, brothers, and himself,'' and he had
promised so to do. At the death of his father, he promised
and agreed with his mother, brothers, and sisters that he
would, ''during the life of his mother, and thereafter and as
long as they would permit him, and until they should require
him to give unto them their respective shares and interests
therein, accept and take upon himself the said trust, take
charge of, build up and enlarge, carry on, conduct and extend
the said business and manage the property thereof in trust for
them and himself in their respective shares under the law as
heirs of his father.''

He so managed the business and the property thereof that
at the death of his mother, in the year 1875, the same was of
the value of one hundred thousand dollars. Upon the death
of his mother he renewed his promises, and continued to man-

age the business and property, investing and reinvesting the proceeds, all apparently in his own name and as absolute owner, until his death, April 15, 1900, when he left an apparent estate of the value of two million five hundred thousand dollars, consisting of money, bonds, stocks, ships, accounts, and other personal property exceeding in value seven hundred and fifty thousand dollars, and many parcels of real property situate in the state of California, Oregon, and Washington. The whole of this property is alleged to be the proceeds of said business, enhanced by the care and management of Hyppolite during the thirty-five years, and to be the property of the beneficiaries of the trust, which, it is claimed, was created when Hyppolite took and retained control of the business upon the promises stated.

It was alleged that the mother, brothers, and sisters had great confidence and trust in him, that "he never denied or repudiated said trust or his said agreements and promises, but always kept and lived up to them," that "he did always . . . from his father's death until his own death admit and acknowledge his said promises and agreements and that he did receive and hold . . . and build up the said business" under said trust, and that all the property held by him was property held under said trust, and that he always promised to account and pay over the respective shares whenever the same were demanded.

It was in terms alleged that no accounting was ever had, and that nothing was ever paid or delivered by Hyppolite to any of the beneficiaries, except that he did partially support his mother during her life.

It is upon these allegations that the plaintiffs come into a court of equity after the death of the alleged trustee, and more than thirty-five years after the creation of the alleged trust, and seek to have it adjudged that the whole of this vast estate, which is necessarily almost exclusively the product of the personal work and business ability of Hyppolite, is trust property, the proceeds of the little commission business of the year 1865.

One of the grounds of demurrer was that it appeared on the face of the complaint that the cause of action therein set forth was barred by the laches of plaintiffs, and this ground of demurrer was held to be well taken.

The plaintiffs here have invoked the aid of a court of equity, and are bound by the rules applicable to equitable proceedings.

Following the maxim that equity aids the vigilant and not those who slumber on their rights, it has been universally declared that only conscience, good faith, and reasonable diligence can call a court of equity into activity, and that, entirely independent of any statutory period of limitations, stale demands will not be aided where the claimant has slept upon his rights for so long a time and under such circumstances as to make it inequitable to enter upon an inquiry as to the validity thereof. Where such is the condition, the demand is, in a court of equity, barred by laches. As has often been said, there is no artificial rule as to the lapse of time or circumstances which will justify the application of the doctrine. Each case as it arises must necessarily be determined by its own circumstances, or as said by this court in *Bell* v. *Hudson,* 73 Cal. 285, 288,[1] [14 Pac. 791] : ''In other words, the question is addressed to the sound discretion of the chancellor in each case.'' Where the lapse of time in the assertion of the claim and the enforcement thereof, taken in connection with the circumstances disclosed are such as to show inexcusable delay on the part of the claimant, considerations of public policy, and the difficulty of doing entire justice obtain and are often sufficient to warrant a court of equity in declining, upon the ground of laches, to commence an investigation. (See, on defense of laches, *Cahill* v. *Superior Court,* 145 Cal. 42, [78 Pac. 469].) The doctrine of laches may be invoked in every class of cases, even in the case of an alleged express trust. It may well be that the relation of trustee and *cestui que trust* may be so acknowledged to exist and to continue to exist as to prevent the application of the doctrine, but, as said by Story in this connection, ''Where this relation is no longer admitted to exist, or time and long acquiescence have obscured the nature and character of the trust or the acts of the parties, or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief upon the ground of lapse of time and its inability to do complete justice. This doctrine will apply even to cases of express trust.'' (Story's Equity Jurisprudence, sec. 1520a. See, also, *Bell* v. *Hudson,* 73 Cal. 285, 287, 288,[1] [14 Pac. 791] ;.

---

[1] 2 Am. St. Rep. 791 and note.

*Seculovich* v. *Morton,* 101 Cal. 673,[1] [36 Pac. 387]; *Taylor* v. *Blair,* 14 Mo. 437, 440.)

It is settled in this state by the two California cases last cited that the defense of laches may be raised by demurrer, the defense being in substance, as said in one of the cases, that the bill does not show equity, or, in the language of our statute, that the complaint does not state · facts sufficient to constitute a cause of action. It therefore devolves on one seeking the aid of a court of equity in a case of this character, where the complaint shows great lapse of time without the assertion of any claim, and long-continued acquiescence in acts hostile to the claim, to allege in his complaint the circumstances showing good faith and reasonable diligence on his part. The complaint will be construed most strongly against the pleader, and if circumstances that might excuse the delay are not alleged, it will be presumed that they do not exist. (See *Bell* v. *Hudson,* 73 Cal. 289,[2] [14 Pac. 791]; *Badger* v. *Badger,* 69 U. S. (2 Wall.) 87, 95.)

Plaintiffs here are compelled to rely entirely on the allegation to the effect that the alleged trust was never repudiated by Hyppolite, but was often acknowledged by him to them to continue to exist, and they invoke the doctrine that so long as the rights of the *cestui que trust* are admitted, laches cannot be set up. These allegations constitute the only basis for a contention that this most remarkable claim was not long ago barred by laches. But in determining as to the sufficiency of this complaint, we are not bound by the bare allegations of acknowledgment by the alleged trustee. We must take the whole complaint together, and, so taken, it presents a case where every act of the alleged trustee was openly and notoriously hostile to the claim of plaintiffs. No such relation between the parties is evidenced by the complaint as would justify the plaintiffs in disregarding these acts and relying upon the mere words of Hyppolite.

For thirty-five years Hyppolite dealt with all property acquired as absolutely his own. He carried on a produce and commission business in his own name. He invested and reinvested the profits thereof in his own name in all kinds of property, in several different states, accumulating a great fortune. He never by any act recognized any other person

---

[1] 40 Am. St. Rep. 106.          [2] 2 Am. St. Rep. 791 and note.

as having an interest therein. He kept no accounts with any of the alleged beneficiaries and rendered none to them. He paid not a cent from his revenues to any of them, except that, in the discharge of a filial duty, he maintained or assisted in maintaining his mother during her life. Four of the alleged original beneficiaries died many years ago, the mother twenty-five years before Hyppolite, and a sister twenty-four years before, a brother twenty-two years before, and a sister fifteen years before, each leaving children entitled to succeed to their parents' property, but these changes brought forth no accounting, no payment of money or delivery of property, no change in the manner of dealing with the property. There is no contention that the acts of Hyppolite in relation to the property were not open and notorious, or that he was ever guilty of any fraudulent concealment or misrepresentation. All these things are inferable from the complaint, and such facts could not be disregarded by the alleged beneficiaries. They show a case where there was in fact no such acknowledgment of an existing trust as would excuse the enforcement of the claim for thirty-five years, and until after the death of the alleged trustee.

They show also a case of acquiescence by the alleged beneficiaries, under such circumstances as to practically compel the conclusion that their claim is without foundation in fact. According to the allegations of the complaint, the trust, the management of this business for their benefit, was to continue until they should demand their shares. It would hardly be contended that the object of such a trust was simply the accumulation of a fortune solely for the heirs of the beneficiaries. If the business belonged to them, they certainly were entitled to something from the profits thereof, which they might enjoy during their lives. It is incredible that plaintiffs should, if their claims be well founded, have refrained from seeking even a portion of the income of their heritage, during all these years, and have made their first demand for anything and their first attempt at enforcement, only after the lips of the alleged trustee had been sealed by death.

The circumstances of this case are such as to make it apparent that a court could not hope to do justice between these parties, were the trust relation clearly shown, and this constitutes another ground for the application of the doctrine of

laches, for the difficulty is due entirely to the inexcusable delay. It was said by the learned judge of the trial court, in sustaining the demurrers: "It is manifest that it would be impossible after the death of Hyppolite Dutard to do justice to the parties by attempting to ascertain what property was left by Bernard Dutard at the time of his decease, and tracing it in all its mutations and transformations down to the time of the death of Hyppolite Dutard. It might almost be said to shock the conscience of a chancellor that he should be asked to undertake such an investigation with any expectation of reaching a conclusion which would be just and equitable to all parties. The parties plaintiff here should have asserted what rights they claim in this property during Hyppolite Dutard's life. By reason of his death it has now become morally impossible for the court to do what it is asked to do by this complaint." In this we entirely concur.

Taken altogether, the case is clearly one where a court of equity is justified in refusing, on the ground of laches, to even enter upon an inquiry as to the merits of the claim. We have examined the cases cited by learned counsel, and find that in such as involved the question of laches the facts were so different from those in the case at bar as to render the cases inapplicable here.

What has been said in regard to the second amended complaint is equally applicable to the cross-complaint.

The conclusion we have reached upon this question renders it unnecessary to consider the other points made in support of the ruling of the court on the demurrers.

The trial court, in sustaining the demurrer to the second amended complaint, refused to allow leave to amend. Plaintiffs except to such refusal and urge that the judgment should be reversed on account thereof. The record does not show in what manner they desired to amend—what change they proposed to make in their complaint, and there is nothing to indicate that they specified in the superior court the nature of the proposed amendment. Under these circumstances we cannot say that the superior court abused its discretion in denying leave to amend. (*Dukes* v. *Kellogg,* 127 Cal. 563, 565, [60 Pac. 44]; *Burling* v. *Newlands,* 112 Cal. 476, 499, [44 Pac. 810]; *Martin* v. *Thompson,* 62 Cal. 618.[1])

The judgment is affirmed.

[1] 45 Am. Rep. 663.

Shaw, J., Van Dyke, J., McFarland, J., Henshaw, J., and Beatty, C. J., concurred.