[Civ. No. 257.   Fifth Dist.   May 19, 1966.]

LEWIS EARL ROUSE, Individually and as Administrator, etc., Plaintiff and Appellant, v. NORVELL B. UNDER-WOOD et al., Defendants and Respondents.

Staniford, Harris & Loomis and John E. Loomis for Plaintiff and Appellant.

Conron, Heard, James & Hamilton and Wayne M. Hamilton for Defendants and Respondents.

CONLEY, P. J.—This is an appeal from a judgment for defendants in a suit brought by Lewis Earl Rouse, individually and as administrator of the estate of Elizabeth B. Rouse, his deceased wife, the ultimate aim of which is to recover certain personal property which he claims is community in nature and which allegedly was transferred by his spouse during her lifetime without his knowledge or consent.

After a 26-day trial in which there were 350 exhibits for plaintiff, 50 exhibits for defendants and almost 3,000 pages of testimony, the judge presiding determined that the claims of the plaintiff were barred by laches, estoppel and acquiescence.

The defendants are Norvell B. Underwood, the decedent's sister, Herbert A. Underwood, her husband, and Elizabeth Jane White, a daughter of Norvell and Herbert, and hence a niece of the decedent. At times in this opinion the defendants are referred to for convenience by their Christian names.

The notice of appeal, prepared and filed by plaintiff's trial counsel (now deceased and replaced on this appeal by other attorneys), recites that the appeal is on "the issues raised by Paragraphs II, III and IV of the Third Cause of Action, relating to the corporate shares; a certain automobile and certain monies in bank, held in joint tenancy by Elizabeth B. Rouse, deceased and certain of the defendants at the time of her death, and to that part of the judgment adjudging that the plaintiffs own no portion of said property, and denying recovery to the plaintiffs of any portion of such jointly held property."

"It is, of course, proper for an appellant to appeal only from a severable portion of a judgment. (*American Enterprise, Inc.* v. *Van Winkle,* 39 Cal.2d 210, 216 [246 P.2d 935] ; . . .) " (*Page* v. *Bakersfield Uniform etc. Co.,* 239 Cal. App.2d 762, 768 [49 Cal.Rptr. 46].)

In view of this express limitation in the notice of appeal, numerous issues mentioned in appellant's briefs are not within the legitimate scope of review and must necessarily be disregarded or merely mentioned in passing. Our inquiry is limited to the issues raised by paragraphs II, III and IV of the third cause of action of plaintiff's first amended complaint. Paragraph II alleges that the defendants entered into an effective plan, without the knowledge or consent of the plaintiff, to convert funds and property of the Rouse community, consisting of (1) various bank accounts opened and maintained in the names of the decedent and Norvell, or in the names of the decedent, Norvell and Elizabeth, as joint tenants; (2) a 1951 Dodge automobile registered in the joint names of the decedent, Norvell and Elizabeth; and (3) certain described shares of the capital stock of Standard Oil Company of California and of Procter & Gamble Company, some standing in the names of the decedent and Norvell, as joint tenants, and some in the names of the decedent, Norvell and Elizabeth, as

joint tenants.[1] In paragraph III of the third cause of action it is alleged that the facts of the various transactions between the decedent and the defendants were concealed from the plaintiff and that he had no knowledge thereof until the period beginning December 15, 1955, and ending about March 1, 1956. Paragraph IV asserts that the defendants hold said property in trust for the plaintiff and that defendants have failed to account therefor or to deliver the property to the plaintiff.

The prayer of the first amended complaint seeks to impress a trust upon the personal property above mentioned and demands an accounting from the defendants.

The answer denies the material allegations of paragraphs II, III and IV of the third cause of action and raises numerous affirmative defenses, only two of which are relevant here, laches and estoppel. The judgment is predicated upon these two affirmative defenses, plus an incidental finding of presumed acquiescence.

After briefing, argument and submission relative to special findings, the trial judge filed a "Memorandum Re Findings," which illuminates the theory employed by him. (*Estate of Bernard*, 206 Cal.App.2d 375 [23 Cal.Rptr. 828].) He declares that two fundamental principles are applicable: (1) Generally speaking, the findings should be on ultimate facts and not on the details of proof (*Hayward Lbr. & Inv. Co. v. Construction etc. Corp.*, 110 Cal.App.2d 1 [241 P.2d 1054]); and (2) the findings as adopted defeat a plaintiff's right of recovery, and the trial court is not required to make additional findings upon other issues. (*Aguirre v. Fish & Game Com.*, 151 Cal. App.2d 469 [311 P.2d 903].) The trial court stated: "I am convinced that findings covering the following matters in a brief, succinct manner would present a clear picture of the reasons for this court's decision. The plaintiff and the decedent were married on July 10, 1918 and lived as husband and wife until the decedent's death on April 25, 1954. Each was employed during substantially all of this time and their earnings constituted community property. Each also acquired other property which, initially, would be considered to be separate property. This property, or the proceeds thereof, was

---

[1] Other property described in paragraph II of the third cause of action is itemized in certain instruments of settlement of a prior action between the same parties, hereinafter referred to, which documents were the subject matter of the first and second causes of action of the complaint and thus are not within the orbit of the present appeal.

commingled with community property so as to lose its status as community [separate?] property. Throughout the marriage, decedent and her sister commingled certain of the community property of the two marital communities and acquired personal property in their joint names or jointly with the other defendants. In addition, decedent made certain gifts, principally to the defendant White, from community property. Plaintiff was aware of certain of this activity on the part of his wife and sister-in-law and made no objection thereto. In addition, plaintiff was in possession of information which would put a reasonably prudent person on inquiry as to the entire course of conduct of decedent. Decedent died testate. . . . By reason of plaintiff's delay in asserting his claim, death, age and the loss of physical evidence [have] acted to prejudice defendants in the presentation of their defense."

In accordance therewith, the trial court then made express findings, including the following: "6. Plaintiff, probably as early as 1923 and certainly by or before 1945, by personal observation and otherwise, obtained actual knowledge of the fact that his spouse and her sister were commingling funds that were the community property of the two marital communities, of the fact that his spouse and her sister had acquired personal property in their joint names, and of the fact that his wife had made gifts to her niece Elizabeth Jane White and to her sister Norvell B. Underwood. Such actual knowledge notwithstanding, with the exception of one occasion which occurred at the latest before midsummer of 1924, plaintiff never objected to this conduct on the part of the sisters collectively or his spouse individually but remained wholly silent concerning the same.

"7. In addition to the actual knowledge referred to hereinabove in finding No. 6, slight though it may have been, at all times during the course of the dealings between the sisters plaintiff also possessed knowledge of a host of other and further facts and circumstances sufficient to put an ordinarily prudent person on inquiry concerning the disposition being made by his deceased spouse of her earnings and of other funds and property that from time to time came into her possession; that such inquiry could easily have been pursued by the plaintiff; that, had such inquiry been pursued with diligence, plaintiff would have discovered the existence of the joint bank account being kept and maintained by the two sisters and the commingling of funds that were in origin the community property of the two separate marital communities,

would have discovered the source of the funds being deposited in the joint bank account kept by the sisters, would have discovered the use being made of withdrawals therefrom, would have discovered the joint dealings in stocks and other personalty being carried on by the sisters, Norvell B. Underwood and Elizabeth B. Rouse, and would have discovered that from time to time his deceased wife had made gifts to her niece, the defendant Elizabeth Jane White.

"8. That from and after 1945 plaintiff was chargeable with knowledge, either actual or constructive, of all of the transactions occurring between his deceased spouse and these defendants, both before 1945 and subsequent thereto.

"9. That plaintiff's continued silence after he was chargeable with full knowledge of all the transactions was reasonably interpreted by the defendants as consent thereto, and that these defendants did change their position to their detriment in reliance thereon.

". . . . . . . . . . . .

"16. The above-entitled action involved and concerned transactions between plaintiff and the decedent from and after 1918 and 1954, a period of thirty-six years, and between the decedent and the defendants covering the same period. Only the decedent and plaintiff were wholly and fully acquainted with all the details of their transactions. Only the decedent and defendant Norvell B. Underwood were wholly and fully acquainted with all of the details of the dealings between the said Elizabeth B. Rouse and the defendants. Elizabeth B. Rouse died approximately seven years before this trial commenced and two years before this action was filed. At the time of trial defendant Norvell B. Underwood was aged more than seventy years and was failing in physical health and mental powers. The whole of the written records that were made and used by the two sisters to record their dealings and balance their accounts have not been preserved and are unavailable to this court. Death has deprived the court of such information as said Elizabeth B. Rouse could supply. The passage of time, advancing years and the mental weakness caused thereby [have] obscured the recollection of factual material or erased the same from the memory of defendant Norvell B. Underwood; Plaintiff's delay in asserting his claim, the death of one of the two principals, the ravages of age upon the other principal and the loss of physical evidence have collectively worked to the prejudice of defendants in preparing and presenting their defense."

The court concluded that the defendant actually or impliedly consented to the transactions occurring between the decedent and the defendants and, having consented, he cannot be heard to demand that the transactions be revoked and that he be restored to the position he was in before the transactions occurred; that by reason of his conduct and that of the defendants in reliance thereon, the plaintiff has subjected himself to the defense of estoppel; that because of his failure to assert his rights and bring a timely suit, his causes of action against the defendants are subject to the defense of laches.

Prior litigation between the parties, which resulted in a former appellate court opinion, centered about the question of whether there was a right to appeal from the denial by the Kern County probate court of a motion to vacate the decree of distribution. (*Estate of Rouse*, 149 Cal.App.2d 674 [309 P.2d 34].) The Fourth District Court of Appeal held that there was no right to appeal from the denial of such a motion. The opinion proceeded by way of dictum to express a view of the court upon other features of the relationship of the parties. The decree itself was based upon a contract and stipulation of the parties settling their respective rights to participate in the estate of the decedent. The agreement provided essentially for an even division of certain specific properties, including the proceeds from five insurance policies, the benefits of the decedent in the State Teacher's Retirement System, and certain specifically described items of personal property.

In its first and second counts, the present complaint seeks to set aside the stipulation and agreement which were involved in the earlier appeal. But on this appeal, the plaintiff has abandoned his earlier position; he has not appealed on those issues.

A copy of the agreement of settlement between Mr. Rouse, Mrs. Underwood and Mrs. White is attached to the amended complaint in this case and marked "Exhibit A." It recites that the parties "desire to amicably settle their respective rights to the property and all of the properties left by said decedent," and provides that the items specifically described shall be divided in equal amounts between Mr. Rouse, on the one hand, and Mrs. Underwood and Mrs. White, on the other. This includes monies due as salary to Mrs. Rouse from her teaching, the money in the State Teacher's Retirement Benefit Fund, life insurance policies and numerous specifically described articles of household furniture and furnishings. The agreement further provides: ". . . In the event that decedent

left any other personal property not listed in Schedule "A", such property shall be appraised and the party taking such article shall pay to the other party one-half of said appraised value on demand, excepting property which was in joint tenancy at the time of death."

The agreement was further evidenced by a stipulation between the attorneys for the parties and approved by the signatures of Mr. Rouse, Mrs. Underwood and Mrs. White. The order settling the final account and the decree of distribution in the probate proceedings enacted the provisions of the agreement and the stipulation.

The final paragraph in the decree of distribution provided as follows: "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the above described property on hand be and the same is hereby distributed as hereinabove set forth and that all other property left by said decedent, whether real or personal and wherever situated and not described or not now known or discovered, be and the same is hereby distributed to L. E. Rouse."

The main thrust of the plaintiff's contentions on appeal is directed to the trial court's findings that recovery is barred by laches and estoppel.

Laches is an equitable defense. It consists of a failure on the part of a plaintiff to assert his rights in a timely fashion accompanied by a period of delay with consequent results prejudicial to the defendant; in proper circumstances, it constitutes an equitable bar to the maintenance of a plaintiff's alleged cause of action. A mere delay, considered alone, does not usually constitute laches; normally, in order to be an effective bar, the delay must be disadvantageous to a defendant, and constitute a quasi-estoppel. (*Cahill* v. *Superior Court*, 145 Cal. 42 [78 P. 467] ; *Swart* v. *Johnson*, 48 Cal.App.2d 829 [120 P.2d 699] ; 18 Cal.Jur.2d, Laches, § 36, p. 201.)

The existence of laches is a question of fact to be determined by a weighing of all of the applicable circumstances by the trial judge. Primarily, the existence of laches is to be determined by the chancellor, and an appellate tribunal ordinarily will not interfere with the discretion of the trial judge unless there is a manifest injustice, or unless the conclusion reached in the court below does not find substantial support in the evidence. (*Wolpert* v. *Gripton*, 213 Cal. 474, 483 [2 P.2d 767] ; *Kleinclaus* v. *Dutard*, 147 Cal. 245 [81 P. 516] ; *Akley* v. *Bassett*, 189 Cal. 625, 647-648 [209 P. 576].)

Pomeroy's Equity Jurisprudence, Fifth Edition, volume 2, section 418, page 169, contains the following: "The principle embodied in this maxim, the original form of which is, *Vigilantibus non dormientibus aequitas subvenit*, operates throughout the entire remedial portion of equity jurisprudence, but rather as furnishing a most important rule controlling and restraining the courts in the administration of all kinds of reliefs, than as being the source of any particular and distinctive doctrines of the jurisprudence. Indeed, in some of its applications it may properly be regarded as a special form of the yet more general principle, He who seeks equity must do equity. The principle thus used as a practical rule controlling and restricting the award of reliefs is designed to promote diligence on the part of suitors, to discourage laches by making it a bar to relief, and to prevent the enforcement of stale demands of all kinds, wholly independent of any statutory periods of limitation. It is invoked for this purpose in suits for injunction, suits to obtain remedy against fraud, and in all classes of cases, except perhaps those brought to enforce a trust against an express trustee."

■ It should be noted, incidentally, that in California the principle of laches may be invoked in a proper case to bar recovery on even an express trust. (*Ewald* v. *Kierulff*, 175 Cal. 363 [165 P. 942].)

Scott on Trusts, Second Edition, volume 4, section 481.1, page 3151, states: ". . . a constructive trustee ordinarily holds the property adversely to the beneficiary, and if the beneficiary knows of the circumstances giving rise to the constructive trust, he may be barred by laches if he fails to sue within a reasonable time."

Pomeroy's Equity Jurisprudence, Fifth Edition, volume 3, section 818, page 250, discusses acquiescence as follows: "Acquiescence consisting of mere silence may also operate as a true estoppel in equity to preclude a party from asserting legal title and rights of property, real or personal, or rights of contract. The requisites of such estoppel have been described. A fraudulent intention to deceive or mislead is not essential. All instances of this class, in equity, rest upon the principle: If one maintain silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent."

Estoppel has been defined by the Supreme Court, in *Davenport* v. *Stratton*, 24 Cal.2d 232, at page 243 [149 P.2d 4], as follows: "Estoppel may be defined to be a bar by which a man

is precluded from denying a fact in consequence of his own previous action which has led another to so conduct himself that, if the truth were established, that other would suffer. [Citation.]"

The existence of laches or estoppel is primarily a question of fact unless but one inference can be drawn from the evidence. (*Beckett* v. *Kaynar Mfg. Co., Inc.,* 49 Cal.2d 695, 700 [321 P.2d 749]; *Teixeira* v. *Verissimo,* 239 Cal.App.2d 147, 158 [48 Cal.Rptr. 496]; *DaSilva* v. *Reeves,* 215 Cal.App.2d 172, 175 [30 Cal.Rptr. 81]; *Goldstein* v. *McNeil,* 122 Cal.App.2d 608, 612 [265 P.2d 113].)

With these general principles in mind we must examine briefly the evidence relative to the three categories of property directly involved on the appeal:

### (1) *The Bank Accounts*

The decedent and her sister had only two joint accounts on the date of her death. One was a savings account with a $36.94 balance, the other a checking account with respect to $18.93. These sums are minuscule—so small and insignificant in themselves that it might be thought that the spirit of the rule *de minimis non curat lex* would apply. However, it is the plaintiff's general contention that commencing with the year 1923 and continuing to the date of death of his wife in 1954, she and her sister maintained successive joint-tenancy accounts in which each deposited funds from the separate marital communities, and from which withdrawals were made for the benefit of each family. His position is that Mrs. Underwood is now under a duty to account to him for every deposit made in every account showing its source and with respect to every withdrawal made showing who made it and for whose benefit it was made, and that there should be an accounting to him for some $94,605 in community funds of the Rouse marriage, which he contends passed through these joint accounts during approximately 30 years.

In 1919, shortly after plaintiff returned home from military service in World War I, he discovered the existence of a bank account in which the decedent, her mother, and Norvell were either joint tenants or as to which all three of them were authorized to draw checks. In 1923 or 1924, the plaintiff again discovered the existence of a bank account in which the decedent and Norvell were joint depositors, and it is shown by the record that plaintiff had been advised by the decedent that she intended to handle her own income as she saw fit and to main-

tain her own bank accounts separate from his; this occurred in 1924 and on occasion before that time. The record shows that plaintiff knew in 1935 and again in 1939 that the decedent and Mrs. Underwood were still using a joint bank account, and that in 1951, the plaintiff had notice that his wife was using an account in a different bank than that in which the marital joint account was maintained. On numerous occasions, plaintiff was in the same room with his wife and Norvell and saw them with bank statements and cancelled checks spread out on the top of a table in the Underwood home as they were working to bring their account into balance.

On only two occasions did the plaintiff object to the defendants concerning the commingling of funds by the two sisters. Herbert Underwood testified that, in 1924, Mr. Rouse stated to the witness that he had discovered the joint account of the two sisters and was going to put a stop to it. The decedent then sought legal advice and at the Underwood home one day at dinnertime the decedent advised the plaintiff, in the presence of the defendants, that she was going to continue to exercise control over her own funds and to use the joint account with her sister. The plaintiff simply said, ''I will see about that.'' No further objection was made during the more than 30 years thereafter that the sisters maintained joint accounts. Again in 1933, it was suggested that shares of stock in Standard Oil Company owned by the Underwoods and shares of stock in the same company owned by the Rouses be pooled. Mr. Rouse said that he would have nothing to do with it.

### (2) *The Dodge Automobile*

On February 26, 1951, the decedent and her sister bought a 1951 Dodge automobile for $2,520.82, of which amount the decedent paid $1,260.41, and Norvell paid the same amount. This car was registered in the names of the decedent, Norvell, and Elizabeth as joint tenants. The plaintiff admitted that he had seen the registration slip on the automobile when he washed the car several times, but he claims that he never read it. He said that his wife told him that the car was bought by Mr. Underwood for Betsy Jane, ''and that is all I knew about it.''

While the plaintiff at first testified that he knew about the car and the manner in which title was taken, he later, under questioning by his attorney, declared that he was confused and that the other automobile, about which he had full information, was a 1940 Dodge. Assuming this to have been an honest

mistake, it must be conceded by the defendants that no evidence was ever developed that plaintiff had actual knowledge of the title to the 1951 Dodge. However, defendants point out that Norvell testified that the funds used by her and similar funds used by the decedent for purchasing the automobile were both a part of the distribution of proceeds of their father's estate which they had received on February 15, 1951, just prior to the purchase of the automobile on February 26, 1951.

### (3) *The Corporate Stock*

At the date of death of the decedent, she and Norvell, as joint tenants, owned stock in the Standard Oil Company of California and in Procter & Gamble Company. Betty Jane White was a third joint tenant as to some of the shares. The decedent and Norvell had jointly owned stock in the Union Oil Company for 22 years and in the R. J. Reynolds Tobacco Company for 17 years. The Union Oil stock and the Reynolds Tobacco stock had been sold during the lifetime of the decedent.

In 1933, the plaintiff and the decedent owned, as community property but issued in his name alone, 26 shares of the common stock of Standard Oil Company of California, and Herbert Underwood owned 23 shares in the same company. Herbert suggested to the plaintiff that the two husbands transfer their shares to the two wives to be pooled. The plaintiff refused. However, several days afterwards he signed the transfer on the stock certificate in blank authorizing a transfer of the Standard Oil stock, and delivered it to his wife. At the date of death, through investments, splits and stock dividends, the Standard Oil Company stock had increased to 12 shares jointly owned by the decedent and Norvell and 128 shares owned by the decedent, Norvell and Betty.

When the Union Oil Company stock and the R. J. Reynolds Tobacco Company stock were sold the plaintiff personally deposited the proceeds of the sale in the joint account maintained by the two sisters. The loss incurred by reason of the purchase and sale of this stock was reported on the joint income tax return filed by the decedent and the plaintiff, which return was signed by the plaintiff.

On many occasions the decedent showed the plaintiff checks for dividends received on the jointly-owned shares, which checks were made payable to both, or all, of the joint tenants.

In an effort to negate the evidence which supports the judgment as to all three categories of property, the plaintiff summarizes extensively his own testimony given at the trial. No useful purpose would be served by repeating that summarization here, since, at most, it merely created a conflict in the evidence, which conflict was resolved by the trial court in favor of the defendants. (*Primm* v. *Primm,* 46 Cal.2d 690, 694 [299 P.2d 231]; *Berniker* v. *Berniker,* 30 Cal.2d 439, 444 [182 P.2d 557].)

▮ Appellant's contention that the pleading of estoppel and laches is not properly directed against the third cause of action is completely unsound from an overall standpoint, for irrespective of the technical niceties of defendants' allegations in their answer, the case was tried with the complete understanding that estoppel and laches were presented to the trial judge for his determination. For example, in objecting to respondents' proposed findings and conclusions of law, trial counsel for the appellant complained of the estoppel element on the sole ground that the evidence did not support the "conclusion that plaintiff had estopped himself from raising any objection from the dealings or demanding an accounting thereof." And as to laches, plaintiff's trial counsel complained that such a conclusion found no support in the facts or the law, and devoted a considerable discussion to that proposition; he did not state anywhere that the defense of laches was not properly before the court. The doctrine of theory of the case by trial is apposite, granting for the sake of argument that the answer does not pinpoint these two affirmative defenses as applicable to the third cause of action. Under that doctrine, a party may not permit an issue to be tried as though it were properly before the court and then on appeal complain that it was not properly pleaded. (*Panopulos* v. *Maderis,* 47 Cal.2d 337 [303 P.2d 738]; *Ernst* v. *Searle,* 218 Cal. 233, 240-241 [22 P.2d 715]; 3 Cal.Jur.2d, Appeal and Error, § 140, p. 604, § 142, pp. 607-609.)

▮ Moreover, it is a well-established principle that the trial court has the power to deny relief, on its own motion, where laches or estoppel is disclosed by the evidence; and whether such a situation exists is a question in the first instance for the trial court's determination. (*Corrigan* v. *Stiltz,* 233 Cal.App.2d 381, 387 [43 Cal.Rptr. 548], and cases there cited.) In *Wynn* v. *Treasure Co.,* 146 Cal.App.2d 69, the court said, at page 75 [303 P.2d 1067]: "While defendants did not plead an estoppel, evidence on which the claimed

estoppel is based was admitted without objection, the issue was fully litigated, and any objection that defendants did not plead the estoppel was waived." (To the same effect: *Pacific Finance Corp.* v. *Foust,* 44 Cal.2d 853, 858 [285 P.2d 632]; *Petersen* v. *Cloverdale Egg Farms,* 161 Cal.App.2d 792, 798 [327 P.2d 127].)

The plaintiff next makes the overall attack that the doctrine of laches does not apply to an action to recover property held by a trustee, because it is claimed that such an action is an action at law (*Peoples Finance etc. Co.* v. *Bowman,* 58 Cal.App.2d 729, 734 [137 P.2d 729]), and that, "The defense of laches does not lie in a law action [citations], and that is the nature of the case at bar." (*Lubin* v. *Lubin,* 144 Cal.App.2d 781, 793 [302 P.2d 49].)

The record discloses that this case was tried on the theory that equitable issues and defenses were basically involved. The plaintiff entitled his pleading, "First Amended Complaint (In equity to set aside judgments, cancel contracts, and for other equitable relief)." By the allegations of the third cause of action and the prayer, plaintiff sought to impress a trust upon property in the hands of the defendants, to have them declared trustees thereof and for an accounting. Such litigation is generally considered to be equitable in nature and we so hold in this case.

The principle of laches was clearly involved in this controversy. The extensive record shows that transactions between Mr. Rouse and his wife occupied a period of 36 years, and that the financial relationship between the deceased and her sister covered the identical period between 1918 and 1954. The two sisters alone were fully acquainted with all of the details of their transactions as they occurred. Mrs. Rouse died on April 25, 1954, at the age of 64 years. The trial commenced almost seven years after her death. At that time Norvell was aged 72 years; her counsel point out that she appeared to be in failing health, both physically and mentally, at that time. There was no adequate written record showing the source and disposition of hundreds of deposits in the joint accounts and no complete and satisfactory evidence as to the use or purpose of the thousands of withdrawals during that time. Most of the casual accounts, as calculated from time to time by the two sisters, were not preserved and were, therefore, unavailable to the court. The plaintiff was approximately of the same age as his wife, having attended high school classes with her; at the time of the trial he was approximately 71 years of age.

Herbert A. Underwood, one of the defendants, was then 69 years old.

Plaintiff's delay in asserting his claim coupled with the death of one of the principal potential witnesses, whose knowledge of the multifarious transactions was vital and in large part irreplaceable, the disabilities of old age affecting the other principals, and the loss or destruction of physical evidence, unquestionably worked to the severe prejudice of the respondents.

In *Garrity* v. *Miller,* 204 Cal. 454, 458 [268 P. 622], it is said: "It is well settled that from considerations of public policy equity will not lend its aid to the enforcement of stale demands. The peace and convenience of society require that such demands be not encouraged. [Citing cases.] 'No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, *or where long acquiescence in the assertion of adverse rights has occurred.* The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible.' " (Italics added.)

*Maguire* v. *Hibernia Sav. & Loan Soc.,* 23 Cal.2d 719, 736 [146 P.2d 673, 151 A.L.R. 1062], approves the foregoing rule.

In *Kleinclaus* v. *Dutard, supra,* 147 Cal. 245, 249, it is said: "Following the maxim that equity aids the vigilant and not those who slumber on their rights, it has been universally declared that only conscience, good faith, and reasonable diligence can call a court of equity into activity, and that, entirely independent of any statutory period of limitations, stale demands will not be aided where the claimant has slept upon his rights for so long a time and under such circumstances as to make it inequitable to enter upon an inquiry as to the validity thereof. Where such is the condition, the demand is, in a court of equity, barred by laches. As has often been said, there is no artificial rule as to the lapse of time or circumstances which will justify the application of the doctrine. Each case as it arises must necessarily be determined by its own circumstances, or as said by this court in *Bell* v.

*Hudson,* 73 Cal. 285, 288 [14 P. 791, 2 Am.St.Rep. 791] : 'In other words, the question is addressed to the sound discretion of the chancellor in each case.' Where the lapse of time in the assertion of the claim and the enforcement thereof, taken in connection with the circumstances disclosed are such as to show inexcusable delay on the part of the claimant, considerations of public policy, and the difficulty of doing entire justice obtain and are often sufficient to warrant a court of equity in declining, upon the ground of laches, to commence an investigation. (See, on defense of laches, *Cahill* v. *Superior Court,* 145 Cal. 42 [78 P. 469].) The doctrine of laches may be invoked in every class of cases, even in the case of an alleged express trust. It may well be that the relation of trustee and *cestui que trust* may be so acknowledged to exist and to continue to exist as to prevent the application of the doctrine, but, as said by Story in this connection, 'Where this relation is no longer admitted to exist, or time and long acquiescence have obscured the nature and character of the trust or the acts of the parties, or other circumstances give rise to presumptions unfavorable to its continuance, in all such cases a court of equity will refuse relief upon the ground of lapse of time and its inability to do complete justice. This doctrine will apply even to cases of express trust.' (Story's Equity Jurisprudence, sec. 1520a. See also *Bell* v. *Hudson,* 73 Cal. 285, 287, 288 [14 P. 791, 2 Am.St.Rep. 791] ; *Seculovich* v. *Morton,* 101 Cal. 673 [36 P. 387, 40 Am.St.Rep. 106] ; *Taylor* v. *Blair,* 14 Mo. 437, 440.) ''

In *Bell* v. *Hudson,* 73 Cal. 285, 288 [14 P. 791, 2 Am.St.Rep. 791], the court quotes with approval this summarization with respect to laches made by Chief Justice Taney in *McKnight* v. *Taylor,* 42 U.S. (1 How.) 161 [11 L.Ed. 86] : '' '. . . In matters of account, where they are not barred by the act of limitations, courts of equity refuse to interfere after a considerable lapse of time, from considerations of public policy, and from the difficulty of doing entire justice when the original transactions have become obscure by time, and the evidence may be lost.' ''

(See also *Neet* v. *Holmes,* 25 Cal.2d 447, 460 [154 P.2d 854] ; *Gravelly Ford Canal Co.* v. *Pope & Talbot Land Co.,* 36 Cal. App. 717, 736-739 [178 P. 155] ; *Zakaessian* v. *Zakaessian,* 70 Cal.App.2d 721, 727 [161 P.2d 677] ; *Austin* v. *Hallmark Oil Co.,* 21 Cal.2d 718, 735 [134 P.2d 777] ; *Newport* v. *Hatton,* 195 Cal. 132, 148 [231 P. 987] ; 19 Am.Jur., Estoppel, §§ 1 and 2, pp. 600-601; 30A C.J.S., §§ 112, 113, pp. 23-31.)

Here, we conclude that the long delay, the death of Mrs. Rouse, the effect of advancing years on the others involved, and the impossibility of resorting to any substantially complete written record during the long period which elapsed, fully justified the trial court in invoking the doctrine of laches, and the allied principles of estoppel and acquiescence. (See *Lichtenberg* v. *Burdell*, 101 Cal.App. 20, 46 [281 P. 518]; *Lindley* v. *Hinch*, 57 Cal.App.2d 717, 720 [135 P.2d 421]; *Marshall* v. *Marshall*, 232 Cal.App.2d 232, 252 [42 Cal.Rptr. 686]; *Bell* v. *Hudson, supra,* 73 Cal. 285, 287-288; *Maguire* v. *Hibernia Sav. & Loan Soc., supra,* 23 Cal.2d 719.)

■    We have not overlooked the plaintiff's charge that the trial judge erred in not adopting some 25 specific findings which he requested; but we have determined that the contention is devoid of merit. Some of the requested findings sought unnecessary interpretation of specific details which are not implicit in the findings of ultimate facts upon which the judgment rests. Some are not proper findings of fact but are statements of matters of law arising from the relationship of husband and wife. Still others are inconsistent with the conclusion reached by the trial judge and could not have been adopted by one holding the views set forth in the findings as made. The trial court's determination that the plaintiff's recovery was barred by the doctrine of laches and estoppel rendered it unnecessary for the judge to adopt the specific findings proposed by the plaintiff.

The judgment is affirmed.

Stone, J., concurred.