[Civ. No. 33902.  Second Dist., Div. Four.  Feb. 5, 1970.]

CHARLES E. McCLUNG, as Executor, etc., Plaintiff and Appellant, v. PAUL S. SAITO et al., Defendants and Appellants.

## COUNSEL

Charles E. McClung, in pro. per., and Wadsworth, Fraser, McClung & Dahl for Plaintiff and Appellant.

Cushman & Jones, Robert B. McCune and Richard D. Jones for Defendants and Appellants.

## OPINION

**FILES, P. J.**—This action was brought to recover the balance due on a $40,000 loan made in connection with a residential tract construction project. The loan was evidenced by a second trust deed note executed by James W. Sullivan, Inc., a corporation, which defaulted. Nine individuals were joined as defendants upon the theory they were members of a joint venture which actually borrowed the money. One of the individuals, James W. Sullivan, was not served and did not appear. After a court trial, a jury having been waived, judgment was entered in favor of plaintiff against all eight remaining defendants in the principal amount of $33,000. Recovery of any interest was denied upon the ground that the transaction was usurious, and all sums which had been paid as interest were credited against principal. The eight appearing defendants have appealed from the judgment, and plaintiff[1] has appealed from so much of the judgment as denied her a recovery of interest.

[1]During the pendency of this appeal the original plaintiff, Desa Petrovich, died. Her executor has been substituted.

Our review of the record satisfies us that the judgment should be affirmed. We shall explain our conclusion that the evidence supports the finding that defendants were parties to a joint venture and that the money was loaned to them, notwithstanding the form of the note, so that they were legally obligated to repay it after the security became valueless; that the transaction was usurious; and that, under the circumstances, the trial court upheld the policy of the usury law by denying to the lender any recovery of interest and refusing to award the borrower treble damages for usury. Before discussing the law it is necessary to describe the background out of which this transaction arose. ■ As the rules of appellate review require (*Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157]) we state the evidence in the light most favorable to the findings of the trial court.

In the spring of 1964, defendant Paul Saito was interested in a potential residential tract development which came to be known as Holiday Hills Estates. The other seven defendants—Paul Okada, James Okada, Pete Okada, John Okada, Dave Asatami, Shig Kawanami and Soichi Fukui—were friends of his who became investors in the enterprise, and who, with Saito, were referred to collectively as the Saito group. The land to be used was owned by L.R.C. Corporation. The builder of the homes was to be James W. Sullivan, a licensed contractor. In July of 1964, seven members of the Saito group (not including Saito) and Sullivan, using the name "James W. Sullivan and Associates," entered into an agreement to acquire, and did acquire, all of the stock of L.R.C. Corporation. It was agreed that 50 percent would be held for Sullivan and 50 percent would be held by the other seven individuals. The documents used in this transaction show Saito signing as agent for the association and for some of its members.

When it was learned that L.R.C. Corporation could not qualify for a construction loan, the land was conveyed, without consideration, to James W. Sullivan, Inc. (hereinafter Sullivan Inc.) which could qualify.

Under date of February 19, 1965, Sullivan Inc., Sullivan and the eight members of the Saito group (including Saito) executed a document headed "Joint Venture Agreement." This document recited that "it was the intention of said parties, as joint venturers, to construct and sell fifty-five homes" and "James W. Sullivan, Inc., is willing to carry out said intent and purpose, for the benefit of said joint venture." The agreement contained among other things these terms, in substance:

The Saito group was to invest $50,000, and not to be liable for any greater sum.

Sullivan was to perform the services of construction engineer and contractor at cost.

Sullivan was to assign 50 percent of his stock in Sullivan Inc. to Saito, to be held by him in trust, until the investment of the Saito group had been repaid.

After repayment of the investment of the Saito group, profits were to be divided 50 percent to the Saito group and 50 percent to Sullivan Inc.

Saito was made secretary and a director of Sullivan Inc., so that he would have knowledge of the corporation's affairs.

A construction loan was obtained from a savings and loan association, secured by a first trust deed on the real property. Sullivan Inc., being the record owner of the realty, was nominally the borrower and trustor under the trust deed which secured the loan. The loan was to be disbursed only upon vouchers showing that the money was being used to pay for construction on the tract. Sullivan Inc. authorized Sullivan and Saito to sign all documents pertinent to the transaction.

By May 1965, it appeared that the enterprise was short of funds. Sullivan was involved in other construction projects in other counties, which were in difficulty, tying up his funds. Saito and Sullivan then sought to borrow money. After they had asked several people to lend money at 20 percent interest, without success, Saito approached Desa Petrovich who had, at sometime past, talked to him about lending money as a form of investment. Saito explained to Miss Petrovich and her brother that he, Saito, was supervising a group that was building houses on the Holiday Hills tract, and that they needed money to complete the model homes and furnish them so sales could be made. Saito took Mr. Petrovich to the tract twice to show him what was being done, and then the two men took Miss Petrovich there to see the model houses. After that Miss Petrovich was taken to meet Sullivan at his office in Stanton, where he talked to her about the work he was doing on the tract. Miss Petrovich said she was not interested in lending at 20 percent interest because she would have to borrow the money from a friend at 10 percent. Saito then offered 30 percent.

Both Saito and Miss Petrovich understood that 10 percent was the maximum legal rate of interest (Cal. Const., art. XX, § 22) and they discussed ways by which she could get around that limitation. Saito suggested that Miss Petrovich be carried as an employee of Sullivan Inc. and receive her compensation that way, but Miss Petrovich didn't want to do that. It was then decided that she would obtain the extra consideration as payment for an option on some real property she owned, and which she had listed for sale at a price of $375,000.

Saito and Sullivan employed an attorney to give advice and prepare the papers for the loan. The latter conferred with Miss Petrovich and her brother, and told them that the option plan was " 'strictly a legal pro-

cedure.' " In the attorney's office Miss Petrovich delivered to Saito and Sullivan a check for $40,000 payable to James W. Sullivan, Inc. and received a note dated May 26, 1965, executed by James W. Sullivan, Inc. by James W. Sullivan, President, and by Paul S. Saito, Secretary, promising to pay $40,000 on or before one year after date, with interest at the rate of 6 percent per annum, payable monthly. The note was secured by a second trust deed on the Holiday Hills Estates property, and contained a release clause allowing each house sold to be released upon a payment of $1,000, to be applied on principal.

Concurrently she executed an option to Sullivan to purchase her real property for one year for a price of $400,000. For this option Sullivan agreed to pay her $9,600, at the rate of $800 per month. Thus the monthly payments of $200 interest plus $800 for the option came to $1,000 per month, equalling the amount which the lender would receive as interest on a $40,000 loan at an annual rate of 30 percent.

There is no direct evidence that the $40,000 was actually used for improvements on the Holiday Hills tract, and there is no finding by the trial court that it was so used. Miss Petrovich turned over to Saito and Sullivan a $40,000 cashier's check. Bank records show that, on May 26, 1965, this check, endorsed by the payee, Sullivan Inc., was deposited in a checking account carried in the name of James W. Sullivan Construction Engineer. Absent a finding by the trial court, we cannot assume that the $40,000 was spent to improve the tract as Saito and Sullivan had represented to the Petroviches it would be.

By August the financial condition of the venture was worse. On November 15, 1965, the eight members of the Saito group filed an action against Sullivan, Sullivan Inc. and others, and obtained the appointment of a receiver for the joint venture. The Saito group put in an additional $30,000 to try to salvage the enterprise. Some of this new money was used to make payments to Miss Petrovich as required under her option agreement and on her trust deed note. Eventually the holder of the first trust deed declared a default and caused the real property to be sold at a trustee's sale in November 1966. The effect was to wipe out the security of the Petrovich second deed of trust. Prior to the filing of this action Miss Petrovich received on her note and option contract a total of $7,000.

## Defendant's Appeal

The trial court found that Sullivan, Sullivan Inc. and the eight persons in the Saito group associated themselves together as joint venturers to acquire Holiday Hills Estates and construct residential dwellings thereon; and that, although legal title to the property was vested for convenience in

Sullivan Inc., the joint venture was the true beneficial owner. These findings are adequately supported in the record. It was reasonable for the trial court to interpret the writing dated February 19, 1965, as evidence of such an arrangement. The writing itself is entitled "Joint Venture Agreement." It provides for a contribution of capital by each of the parties for the purpose of developing Holiday Hills Estates, and it provides for a sharing of net profits from that enterprise.

That document is not clear as to whether Saito was to participate as a beneficial owner or only as a representative of the other seven, but it seems to have been understood that he was an investor and beneficially interested in a share of the profits. Defendant James Okada testified it had been agreed that Saito would put in $50,000 in addition to the $50,000 that the other seven were putting in. Saito testified to putting in money to try to relieve the venture's financial distress in the summer of 1965.

In the action filed by the Saito group on November 15, 1965, to obtain the appointment of a receiver, the complaint, verified by Paul Saito, alleged that they, together with Sullivan Inc. and Sullivan, as joint venturers, were the owners of Holiday Hills Estates, and that title was in Sullivan Inc. for convenience only.

■ Defendants have called themselves joint venturers, and they have established by their own statements that they were coowners of an enterprise in which they were to share net profits. Such an arrangement imposes upon them the obligations of members of a partnership. (See Corp. Code, §§ 15006, 15007, subd. (4).) Each of the defendants thus has become jointly liable to creditors for the obligations of the enterprise (Corp. Code, § 15015), despite the agreement among themselves that the Saito group would not be liable beyond the amount of the original investment. (See *Gardiner v. Gaither* (1958) 162 Cal.App.2d 607, 617 [329 P.2d 22].)

■ There is no merit in defendants' contention that the court should have interpreted their agreement as creating a "Massachusetts or Business Trust" of the kind described in *Goldwater v. Oltman* (1930) 210 Cal. 408 [292 P. 624, 71 A.L.R. 871]. It is true that Saito was referred to in the February 19, 1965, agreement as trustee for the other individuals making up the Saito group, but this was done as a means of simplifying the management. The other seven individuals did not wish to be active, and looked to Saito to represent them.

■ Defendants contend that (1) even if they are joint venturers, Commercial Code section 3401 protects them from liability on a note made in the name of another, and (2) they cannot be held liable for restitution of money had and received because they did not receive anything.

Commercial Code section 3401, subdivision (1), provides "No person is liable on an instrument unless his signature appears thereon."

The Official Comments on the Uniform Commercial Code, from which this section is taken, contain this: "Nothing in this section is intended to prevent any liability arising apart from the instrument itself. The party who does not sign may still be liable on the original obligation for which the instrument was given, . . ."

In *First Western Bank & Trust Co.* v. *Bookasta* (1968) 267 Cal.App.2d 910, 914 [73 Cal.Rptr. 657], the court said, in reference to section 3401: "Of course, the non-signing party may nonetheless remain liable on the original obligation for which the instrument was given, or on other facts and circumstances relating to the same transaction."

This is consistent with California law as it existed prior to the adoption of the Uniform Commercial Code. The law distinguishes between an action upon a promissory note and an action to recover the consideration given for the note. (See *Schwaegler Co.* v. *Marchesotti* (1948) 88 Cal.App.2d 738, 746 [199 P.2d 331].)

We turn then to defendants' contention that they need not repay because they did not receive the consideration. The evidence shows that Saito told Miss Petrovich her money was borrowed in order to complete and furnish the model homes. The model homes were owned by the joint venture, whose business purpose was to sell these homes at a profit and divide the proceeds among the joint venturers. The real property owned by the joint venture was given as security for Miss Petrovich's loan.

All of the negotiations for the loan were conducted by Saito or in his presence. Saito was present in the attorney's office when the papers were signed and the check was delivered. Saito and Sullivan were the managers of the joint venture, as well as officers of Sullivan Inc. Sullivan was the man who had been handling the money, and Saito's functions were, among other things, to raise money for the venture and see that the investors were protected by the proper use of it. It is an inescapable inference that Saito consented to Sullivan's taking personal possession of the $40,000 check.

This evidence supports the finding of the superior court that "The plaintiff's loan was made for the benefit of the joint venture and was consented to by all of the joint venturers." The joint venture received the $40,000 when the check was delivered to its managers, Saito and Sullivan. In this action, involving only the rights of a creditor of the venture, we are not concerned with how they spent it.

Defendants' next contention is that plaintiff is guilty of laches. Defendants' theory appears to be that plaintiff should have started foreclosure

proceedings as soon as there was a default on her note, prior to the foreclosure of the first trust deed held by the savings and loan association. Such a foreclosure would have placed Miss Petrovich in possession of a failing business which was about to be wiped out by the holder of the first encumbrance. Defendants offer no citation of authority in support of this claimed duty of self-immolation.

■ Laches is ordinarily a question of fact. (*Rouse* v. *Underwood* (1966) 242 Cal.App.2d 316, 323 [51 Cal.Rptr. 437].) Here the action was commenced on January 4, 1967, less than eight months after the note was due. The trial court found no laches. We cannot say this finding is unsupported in the record.

Defendants argue that under the usury law[2] the trial court should have awarded to them, as an offset, treble the amount of interest which they had paid. ■ The granting of treble damages upon a finding of usury is discretionary with the trial court. (*Burr* v. *Capital Reserve Corp.* (1969) 71 Cal.2d 983, 994 [80 Cal.Rptr. 345, 458 P.2d 185]; see *White* v. *Seitzman* (1964) 230 Cal.App.2d 756, 761 [41 Cal.Rptr. 359].) In the case at bench defendants, like the borrower in the *White* case, provided the "guiding hand in the transaction." Moreover, the trial court found that defendants had, through the advice of their attorney, led plaintiff to believe that the transaction was legal. It was not an abuse of discretion to refuse to award defendants treble damages.

■ Finally, defendants contend that the judgment should be reversed because the trial court failed to make findings upon a long list of matters upon which findings were requested. Our review of the record satisfies us that the trial court found all of the facts which were necessary to support the judgment and overcome the pertinent theories of the defense. This is sufficient compliance with Code of Civil Procedure sections 632 and 634.

### Plaintiff's Appeal

■ Plaintiff contends that there was no usury because the trial court found that Miss Petrovich at all times honestly believed that the transaction was legal and the obligations were enforceable. This argument is fully answered in *Thomas* v. *Hunt Mfg. Corp.* (1954) 42 Cal.2d 734 [269 P.2d 12]. In that case usury was accomplished by paying the lender a salary, which was in fact additional compensation for the loan. The Supreme Court said (at p. 740): "Plaintiff argues further that intent is an element of usury and that since neither Hunt nor Thomas, according to their testi-

---

[2]Stats. 1919, p. lxxxiii, § 3; Deering's Gen. Laws, 1954, Act 3757, § 3; West's Civ. Code, § 1916-3.

monies, had a conscious intent to evade the usury law, the finding of usury cannot be sustained. But the intent sufficient to support the judgment does not require a conscious attempt, with knowledge of the law, to evade it. The conscious and voluntary taking of more than the legal rate of interest constitutes usury and the only intent necessary on the part of the lender is to take the amount of interest which he receives; if that amount is more than the law allows, the offense is complete."

In the case at bench plaintiff understood that the legal rate was 10 percent, and she intended to get more than that. Her mistaken belief the device employed would be legal and enforceable does not make it so.

█ Plaintiff's other contention is "The defendants are estopped to assert that plaintiff's loan is usurious." This argument is based upon the evidence and findings which support the trial court's determination that defendants are estopped to recover treble damages. But usury law does not place borrower and lender on the same footing. The fact that both go into the transaction willingly does not place them *"in pari delicto."* (See *Stock* v. *Meek* (1950) 35 Cal.2d 809, 816 [221 P.2d 15].) The policy of the usury law in a case such as this one is served by refusing either a recovery of interest or an award of treble damages. (See *White* v. *Seitzman, supra,* 230 Cal.App.2d 756, 761-762.)

The judgment is affirmed.

Kingsley, J., and Dunn, J., concurred.

A petition for a rehearing was denied February 25, 1970, and the petition of the defendants and appellants for a hearing by the Supreme Court was denied April 1, 1970.